**FRATERNAL ORDER OF POLICE, Appellant,**

v.

**UNITED STATES of America, Appellee.**

No. 97–5304.

United States Court of Appeals, District of Columbia Circuit.

Argued May 15, 1998.

Decided Aug. 28, 1998.

---

William J. Friedman, IV argued the cause and filed the briefs for appellant.

Robert M. Loeb, Attorney, U.S. Department of Justice, argued the cause for appellee. With him on the brief were Frank W. Hunger, Assistant Attorney General, Wilma A. Lewis, U.S. Attorney, and Mark B. Stern, Attorney, U.S. Department of Justice.

Before: WILLIAMS, GINSBURG and RANDOLPH, Circuit Judges.

STEPHEN F. WILLIAMS, Circuit Judge:

The Fraternal Order of Police, an association of law enforcement officers, brought suit challenging certain provisions of the 1996 amendments to the Gun Control Act of 1968, 18 U.S.C. § 921 et seq. The Order alleged that these provisions exceeded Congress's power under the Commerce Clause, and also that they ran afoul of the Second, Fifth, and Tenth Amendments. The district court granted summary judgment for the government. Finding that the Order has standing to raise its claim under the equal protection component of Fifth Amendment due process, see *Bolling v. Sharpe,* 347 U.S. 497, 499, 74 S.Ct. 693, 98 L.Ed. 884 (1954), and finding merit in that claim, we reverse.

\* \* \*

As relevant here, the essence of the 1996 amendments was to (1) extend a pre-existing criminalization of firearms possession by persons convicted of domestic violence felonies to persons convicted of domestic violence misdemeanors; and (2) to withhold from the misdemeanants—but not the felons—an exception for firearms issued for the use of any state or locality (the so-called "public interest exception"). The Gun Control Act, now as before, also applies to anyone who supplies a person with a firearm in the face of this and related proscriptions.

The amendments bringing about this change are as follows: Section 922(d)(9) of Title 18 makes it illegal to provide a firearm to any person "convicted in any court of a misdemeanor crime of domestic violence"; § 922(g)(9) prohibits such misdemeanants from possessing or receiving firearms. Section 922(g)(9) limits its scope to possession in or affecting interstate commerce, or firearms transported in interstate commerce; § 922(d)(9) contains no similar limitation. Relief from the disability thus imposed is governed in part by § 925(a)(1), which provides that the prohibitions of § 922 generally do not apply to firearms issued for the use of "any State or any department, agency, or political subdivision thereof." Section 925(a)(1) explicitly excludes §§ 922(d)(9) and 922(g)(9) from this public interest exception.

Sections 922(d)(9) and (g)(9) thus forbid the states to arm those members of their police forces, militias, or National Guards who possess disabling misdemeanor convictions; they criminalize both the officers' ac-

ceptance of the states' firearms and the provision of the firearms by any person, including (presumably) any state's representative. The disability operates regardless of the date of the conviction. So the new bans can be expected to affect a significant number of current police officers. The Joint Appendix contains several newspaper articles recounting instances in which officers were required to turn in their guns, and it was in view of this prospect—though not solely on behalf of members directly threatened with the firearm disability—that the Order brought suit.

\* \* \*

■ The threshold question on appeal is whether the Order has standing to pursue its claims. We find it necessary to address only the standing claim based on the interests of members who are chief law enforcement officers ("CLEOs"). Although the Order's briefs make vague allusions to some legal theories that would entail broader relief than is suitable for the Equal Protection claim brought by the Order on behalf of the CLEOs, they fail to develop such theories. So there is no need to assess the standing possibly underlying such inchoate claims.

■ For a party to establish the sort of "case" or "controversy" over which Article III creates federal jurisdiction, it must satisfy the now familiar tripartite requirements of "(1) an injury in fact, (2) a causal relationship between the injury and the challenged conduct, and (3) a likelihood that the injury will be redressed by a favorable decision." *United ed Food and Commercial Workers Union Local 751 v. Brown Group, Inc.*, 517 U.S. 544, 551, 116 S.Ct. 1529, 134 L.Ed.2d 758 (1996). An association such as the Order, which alleges no injury to itself as an organization, may, according to *Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977), sue on behalf of its members if it can show that "(a) its members would otherwise have standing to sue in their own right; (b)

the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Id.* at 343, 97 S.Ct. 2434. The first of these elements ensures the presence of a case or controversy and is constitutional in nature. See *Warth v. Seldin*, 422 U.S. 490, 511, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). It is the only one the government contests and the only one with respect to which we can see any difficulty.

Several CLEOs allege that enforcement of the 1996 amendments conflicts with their obligations under state law. Although there is no indication that this is true in the hard core sense of federal law requiring any CLEO to do something state law forbids (or vice versa), it seems true in the broader practical sense that if a CLEO complies with the domestic violence misdemeanor provisions, he will find himself, in any enforcement activity requiring firearms, unable to use officers who fall under the federal ban, even where in his judgment it is highly desirable or even critical to use such officers. The government presents no reason to think that this interference should not qualify as an Article III injury, and we can see none.

■ There remains the issue of whether the CLEOs would have "prudential standing," i.e., whether the interests they seek to advance are "arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question." *Ass'n of Data Processing Service Orgs. v. Camp*, 397 U.S. 150, 153, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970).[1] As to the equal protection claim (the only claim it is necessary to reach), of course, the CLEOs are not members of the class that the statute is said to illegally disadvantage—law officers convicted of domestic violence misdemeanors, who are barred from the benefits of the public interest exception (as opposed to law officers convicted of domestic violence felo-

---

**1.** Whether a prudential defect in a member's standing translates to a constitutional defect in the association's is a nice question. Superficially, one might conclude that it would, since the cases treat the first element of the *Washington Apple* test as (entirely) constitutional. See, e.g., *United Food and Commercial Workers*, 517 U.S. at 554–55, 116 S.Ct. 1529. But since this constitutional character stems from the case or controversy requirement, see *id.*, and prudential defects do not affect the existence of a case or controversy, it seems more likely that a member's lack of prudential standing translates to a similar prudential failing for the association.

nies, who are not). But where a person is effectively used by the government to implement a discriminatory scheme, he may, as we held in *Lutheran Church–Missouri Synod v. FCC,* 141 F.3d 344, 350 (D.C.Cir.1998), "attack that scheme by raising a third party's constitutional rights." There we followed *Barrows v. Jackson,* 346 U.S. 249, 259, 73 S.Ct. 1031, 97 L.Ed. 1586 (1953), which allowed a white homeowner to invoke the equal protection rights of nonCaucasian third parties in resisting the petitioner's effort to enforce a racially restrictive covenant, and *Craig v. Boren,* 429 U.S. 190, 194–97, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976), which allowed a licensed beer vendor to invoke the equal protection claims of males aged 18 to 21 who were barred from beer purchase by a statute that allowed purchases by females of that age.

Although neither *Barrows* nor *Craig* is crystal clear as to just when a person whose injury qualifies under Article III may invoke the interests of a third party, the Court in *Craig* seemed to embrace the proposition asserted in a student law review note, namely, that he should be able to assert those third-party rights that would be infringed by his compliance. See 429 U.S. at 195, 97 S.Ct. 451, citing Note, Standing to Assert Constitutional Jus Tertii, 88 Harv. L.Rev. 423, 432 (1974). As any CLEO who gave a firearm to a law enforcement officer who had been convicted of a domestic violence misdemeanor would be liable himself under § 922(d)(9), his compliance (i.e., *not* supplying the officer with the gun) would indeed defeat the rightholder's interest. Thus CLEOs have standing to assert the equal protection rights of police officers—members or not—threatened with deprivation of their firearms; the presence of CLEOs as members gives the Order standing to makes these claims as well.

\* \* \*

▉▉▉ Equal protection analysis is substantially identical under the Fifth Amendment and the Fourteenth. See *Adarand Constructors, Inc. v. Pena,* 515 U.S. 200, 227, 115 S.Ct. 2097, 132 L.Ed.2d 158 (1995). Usually the outcome turns largely on the level of scrutiny to be applied. If a law neither burdens a fundamental right nor targets a suspect class, courts must uphold the legislative classification so long as it bears a ration-

al relation to some legitimate end. See, e.g., *Heller v. Doe,* 509 U.S. 312, 319, 113 S.Ct. 2637, 125 L.Ed.2d 257 (1993). Laws that fall into either of the above categories, however, are subjected to strict scrutiny. See, e.g., *City of Cleburne v. Cleburne Living Center,* 473 U.S. 432, 439–40, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985) (discussing tiers of scrutiny). The Order concedes that persons convicted of domestic violence misdemeanors are not a suspect class but asserts that the 1996 amendments impinge on a fundamental right—the right to bear arms guaranteed by the Second Amendment. The government responds that the Second Amendment right does not belong to individuals, but exists only in relation to "the preservation or efficiency of a well regulated militia," *United States v. Miller,* 307 U.S. 174, 178, 59 S.Ct. 816, 83 L.Ed. 1206 (1939), and that the 1996 amendments do not restrict state militias.

Analysis of the character of the Second Amendment right has recently burgeoned. See, e.g., Akhil Reed Amar, *The Bill of Rights* 257–67 (1998); David C. Williams, *Civic Republicanism and the Citizen Militia: The Terrifying Second Amendment,* 101 Yale L.J. 551, 572–86 (1991); compare *Hickman v. Block,* 81 F.3d 98, 101–03 (9th Cir. 1996), with *United States v. Gomez,* 92 F.3d 770, 774 n. 7 (9th Cir.1996). Despite the intriguing questions raised, we will not attempt to resolve the status of the Second Amendment right, for we find that the 1996 amendments fall into the narrow class of provisions that fail even the most permissive, "rational basis," review. See, e.g., *City of Cleburne,* 473 U.S. 432, 105 S.Ct. 3249, 87 L.Ed.2d 313.

Section 925 extends the "public interest" exception to all sources of the firearm disability except domestic violence misdemeanors. It thus allows the states to arm police officers convicted of violent felonies, and even crimes of domestic violence *so long as those crimes are felonies,* while withholding this privilege with respect to domestic violence misdemeanors. No reason is offered for imposing the heavier disability on the lighter offense. The government's brief argues that a special focus on domestic violence as compared to other misdemeanors is rational, and

we agree. The defect is the neglect of more severe crimes of domestic violence, about which the government says nothing.

 A conceivable justification comes to mind. As a law survives rational basis review if it is rational under any "reasonably conceivable state of facts," *Heller v. Doe,* 509 U.S. 312, 320, 113 S.Ct. 2637, 125 L.Ed.2d 257 (1993) (citation omitted), we address this despite the government's having failed to mention it. Most states appear to bar convicted felons from possessing guns. See, e.g., Cal.Penal Code § 12021(a)(1) (felon's possession of firearm is felony); North Carolina Stat. § 14–415.1 (same) Oklahoma Stat. Title 21 § 1283 (same); Rhode Island Gen. Laws§ 11–47–5 (same); Texas Penal Code § 46.04 (same); Wisconsin Stat. § 941.29 (same); Wyoming Stat. § 6–8–102 (same). Few—perhaps only New York—provide any public interest exception. See N.Y. Penal L. § 265.20 (exempting New York military, police officers, and peace officers). The government might therefore argue that federal law has stepped in merely to fill a practical gap: concluding that all persons guilty of domestic violence should be barred from possession of firearms, without regard to public interest, but noting that the states have satisfactorily addressed the issue except for the misdemeanor offender, Congress has taken care of this neglected problem. But this analysis would allow a rougher notion of justice than even "rational basis" review allows.

The problem is that the states' laws are neither sufficiently consistent, nor sufficiently severe, to make this a rational approach. New Hampshire, for example, requires three felonies for the prohibition to attach. See N.H. Stat. Title XII § 159:3–a. Vermont does not prohibit gun possession by felons who are convicted but never incarcerated. *McGrath v. United States,* 60 F.3d 1005, 1007 (2d Cir.1995). As we have noted, at least New York seems to offer a public interest exception. And while the laws of most states do bar felons from possessing firearms even in the public interest, many states have disabilities of limited duration, and the duration varies from state to state. See, e.g., Maine Rev. Stat. Title 15 § 393 (application for permit allowed after five years); North Dakota Stat. § 62.1–02–01 (ten years); South Dakota Stat. § 22–14–15 (fifteen years).

Once these periods have expired, firearm rights are restored. The resulting anomalies flow well beyond those normally arising from federalism. The worse offenders may enjoy some restoration of lost rights under state law, while the lesser face an implacable bar.

The government notes, following up its point that Congress may distinguish between crimes of domestic and violence and other crimes, that a legislature does not violate the equal protection clause merely because it approaches an issue "one step at a time, addressing itself to the phase of the problem which seems most acute to the legislative mind." *Williamson v. Lee Optical of Oklahoma, Inc.,* 348 U.S. 483, 489, 75 S.Ct. 461, 99 L.Ed. 563 (1955). But this aspect of equal protection law is of little help for Congress's decision to impose a more severe regime on domestic violence misdemeanants than on domestic violence felons. Whatever precise elements may influence a state's classification of offenses between those two categories, what is uniform and undisputed is that the presence of some aggravating circumstance (or perhaps the absence of a mitigating one) is necessary to establish a felony. Of course Congress may take "one step at a time." But here, while incorporating state law (and judgments thereunder) into its scheme, it has stepped most harshly on those persons the states have systematically deemed less culpable.

We note, finally, that the treatment of domestic violence misdemeanants intersects with certain anomalies in Congress's provision for deferring to state law on restoration of civil rights. For the purposes of the firearm disability generally, 18 U.S.C. § 921(a)(20) provides that convictions for which civil rights have been restored do not trigger the disability. See *United States v. Bost,* 87 F.3d 1333, 1335 (D.C.Cir.1996) (discussing state restoration of rights). An equivalent provision, § 921(a)(33)(B)(ii), allows state restoration of civil rights to lift the federal disability from domestic violence misdemeanants. But few states (if any) deprive such misdemeanants of civil rights. With no deprivation, there can be no "restoration" in the ordinary sense of the term. See *McGrath,* 60 F.3d at 1007–10 (holding that felon whose civil rights were not revoked

could not argue that they had been restored). Thus the plain text of the statute seems to put misdemeanants who have never lost their rights in a worse situation than felons whose rights are restored, often by automatic operation of state law. See, e.g., *United States v. Caron*, 77 F.3d 1, 2–4 (1st Cir.1996) (holding that individualized restoration of civil rights is not required to lift firearm disability).

This anomalous consequence of the "civil rights restored" provision is not confined to domestic violence misdemeanors. Any conviction that triggers the disability but does not deprive the convict of civil rights will produce a similar result. Thus misdemeanors carrying a sentence of more than two years (which count as qualifying convictions under § 921(a)(20)), or felonies not accompanied by revocation of civil rights, will also activate the federal disability with no prospect of relief via restoration of civil rights.

The First Circuit has responded to this discrepancy by holding that the "civil rights restored" provision of § 921(a)(20) protects those who have never been deprived of civil rights. See *United States v. Indelicato*, 97 F.3d 627, 630–31 (1st Cir.1996). That case involved a person convicted of a misdemeanor for which state law provided a maximum term of two and a half years, i.e., a felony for purposes of § 921(a)(20). But its reasoning applies to § 921(a)(33)(B)(ii) equally, and in that context cuts much more deeply. So far as we know, no state responds to a domestic violence misdemeanor conviction by revoking the right to vote, hold office, or serve on a jury. (These are the civil rights on which the statute focuses. See *Bost*, 87 F.3d at 1335.) If failure to revoke is treated as restoration, then §§ 922(g)(9) and (d)(9) become entirely without effect: no conviction for a domestic violence misdemeanor would trigger the federal disability, since no such misdemeanor would qualify under § 921(a)(33). On the other hand, if the absence of any initial deprivation renders the restoration provisions inapplicable, then § 921(a)(33)(B)(ii), expressly inserted to provide for restoration in the case of domestic violence misdemeanors, is itself without effect. Because we find §§ 922(g)(9) and (d)(9) in violation of equal protection requirements independently, we need not address the interpretive and other issues posed by the "restoration" provisions.

\*　　\*　　\*

This brings us to the question of remedy. The Order makes various alternative requests, one of which is that we hold § 925 inoperative. Section 928 of the Gun Control Act explicitly provides that the invalidation of one provision shall not affect the remainder of the Act. We think the most appropriate remedy is consequently to hold that § 925 is unconstitutional insofar as it purports to withhold the public interest exception from those convicted of domestic violence misdemeanors. The government may not bar such people from possessing firearms in the public interest while it imposes a lesser restriction on those convicted of crimes that differ only in being more serious. Of course we do not decide whether a broader revocation of the public interest exception— for example, from all those convicted of *any* crime of domestic violence—would be constitutional.

*So ordered.*