**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Kirk J. LEWITZKE, Defendant–Appellant.**

No. 98–2292.

United States Court of Appeals, Seventh Circuit.

Argued Dec. 3, 1998.

Decided May 12, 1999.

John W. Vaudreuil (argued), Peggy A. Lautenschlager, Office of the United States Attorney, Madison, WI, for Plaintiff–Appellee.

Winston P. Brown (argued), Milwaukee, WI, for Defendant–Appellant.

Before CUDAHY, RIPPLE, and ROVNER, Circuit Judges.

ILANA DIAMOND ROVNER, Circuit Judge.

A jury found Kirk J. Lewitzke guilty of possessing six firearms after having been convicted of a misdemeanor crime of domestic violence, in violation of 18 U.S.C. § 922(g)(9). The district court ordered him to serve a prison term of fifteen months. Lewitzke appeals, contending that section 922(g)(9) irrationally bars persons convicted of domestic violence misdemeanors from possessing firearms, in violation of equal protection principles, and that the district judge erred at sentencing when she found that the guns he possessed were not used solely for sporting purposes (*see* U.S.S.G. § 2K2.1(b)(2)).[1] We affirm.

## I.

On June 24, 1997, Stephen W. Lawroski, a special agent with the federal Bureau of Alcohol, Tobacco and Firearms, conducted a warrant-authorized search of Lewitzke's home on the outskirts of Wausau, Wisconsin with the assistance of other law enforcement personnel. Six firearms and some three thousand rounds of ammunition were seized. Nearly ten years earlier, Lewitzke had pleaded guilty to charge of misdemeanor domestic battery. Consequently, pursuant to 18 U.S.C. § 922(g)(9), it was unlawful for Lewitzke to possess a firearm which has moved in interstate commerce; and a grand jury issued a one-count indictment charging him with that offense. The parties later stipulated that each of the guns seized from Lewitzke's home was manufactured outside the state of Wisconsin and consequently had been transported in interstate commerce prior to June 1997. R. 96 at 125.

Lewitzke was tried before a jury in February 1998. Defense witnesses testified that Lewitzke had become aware in January 1997 that he was no longer permitted to possess firearms in light of his prior domestic violence conviction, and that Lewitzke at that time had surrendered possession of every gun then in his possession to his father. The defense theory was that the guns found in Lewitzke's home in June 1997 had been left there by his father, brother, and friends. Lewitzke and his family had constructed a large earthen berm and shooting range in his backyard in the early 1990s, and defense witnesses testified that friends and family stopped by the house regularly to engage in recreational target shooting. Nonetheless, in the face of evidence that guns and/or ammunition had been found in nearly every room of Lewitzke's home, the jury found him guilty of unlawful possession.

Judge Crabb sentenced Lewitzke on May 12, 1998. The base offense level of 12 was enhanced by two levels because six firearms were involved. *See* U.S.S.G. § 2K2.1(b)(1)(B). Lewitzke urged the judge to reduce the offense level to 6, on the ground that the guns were used solely for a sporting purpose (target shooting). *Id.* § 2K2.1(b)(2). Judge Crabb denied the reduction, relying in part upon Agent Lawroski's opinion that several of the guns are not generally used for sporting purposes and in part upon where in Lewitzke's home two of the guns had been found, their locations suggesting to the judge that they were not being kept for sporting purposes. As we have noted, the judge sentenced Lewitzke to a prison term of fifteen months (the bottom of the guideline range), to be followed by a thirty-six-month period of supervised release.

---

1. Lewitzke argued in his opening brief that section 922(g)(9) also violates the ex post facto clause of the Constitution. However, he withdrew that argument in his reply brief (Reply at 5), and we consequently do not address it.

## II.

### A.

In 1996, Congress added a new provision to the Gun Control Act of 1968 prohibiting anyone previously convicted of a "misdemeanor crime of domestic violence" from possessing any firearm or ammunition "in or affecting commerce." *See* 18 U.S.C. § 922(g)(9). A "misdemeanor crime of domestic violence" is defined as a federal or state misdemeanor which "has, as an element, the use or attempted use of physical force, or the threatened use of a deadly weapon, committed by a current or former spouse, parent, or guardian of the victim, by a person with whom the victim shares a child in common, by a person who is cohabiting with or has cohabited with the victim as a spouse, parent, or guardian, or by a person similarly situated to a spouse, parent, or guardian of the victim." 18 U.S.C. § 921(a)(33)(A).[2] The Bureau of Alcohol, Tobacco and Firearms has taken the position that "[t]his definition includes all misdemeanors that involve the use or attempted use of physical force (e.g., simple assault, assault and battery) if the offense is committed by one of the defined parties." Department of the Treasury, Bureau of Alcohol, Tobacco and Firearms, Open Letter to All State and Local Law Enforcement Officials (last modified February 27, 1998) <http://www.atf.treas.gov/core/firearms/information/opltrleo.htm>. "This is true whether or not the State statute or local ordinance specifically defines the offense as a domestic violence misdemeanor." *Id.*

■ Lewitzke contends that section 922(g)(9), in prohibiting persons convicted of domestic violence from possessing firearms, violates the equal protection component of the Fifth Amendment's due process clause. *See Bolling v. Sharpe*, 347 U.S. 497, 499, 74 S.Ct. 693, 694, 98 L.Ed. 884 (1954); *Buckley v. Valeo*, 424 U.S. 1, 93, 96 S.Ct. 612, 670, 46 L.Ed.2d 659 (1976); *Markham v. White*, 172 F.3d 486, 491–92 (7th Cir.1999). He asserts that it is illogical to preclude all those who have been convicted of domestic violence crimes from possessing a gun, no matter how long ago their offenses may have occurred. He also suggests that it is irrational to single out those who engage in domestic violence for the firearms ban, when those convicted of other violent misdemeanors may be just as likely to misuse their guns. Whether the firearms ban contained in section 922(g)(9) is contrary to the mandate that all citizens be afforded equal protection of the law is a question of law that we address de novo. *E.g., United States v. Wilson*, 159 F.3d 280, 285 (7th Cir.1998), *petition for cert. filed* (U.S. Mar. 29, 1999) (No. 98–8724).

■ The parties agree that the classification at issue in this case need only have a rational basis to survive equal protection scrutiny. *See United States v. Jester*, 139 F.3d 1168, 1171 (7th Cir.1998); *Sklar v. Byrne*, 727 F.2d 633, 637 (7th Cir.1984). In other words, singling out persons convicted of domestic violence offenses for the firearms disability must be "rationally related to a legitimate [governmental] interest." *City of New Orleans v. Dukes*, 427 U.S. 297, 303, 96 S.Ct. 2513, 2517, 49 L.Ed.2d 511 (1976) (per curiam). This test amounts to "the most relaxed and tolerant form" of equal protection review. *City of Dallas v. Stanglin*, 490 U.S. 19, 26, 109

---

**2.** The statute provides further that a person shall not be considered to have been convicted of such an offense unless he was represented by counsel in the misdemeanor proceeding or knowingly and intelligently waived the right to counsel and (as to charges for which the defendant was entitled to a jury trial) was tried by a jury or knowingly and intelligently waived the right to a jury trial. *Id.* § 921(a)(33)(B)(i). Nor shall a person be deemed to have committed such a crime if his conviction has been set aside or expunged, or the offense is one for which the individual has been pardoned or has had his civil rights restored, unless the pardon, expungement, or restoration of rights expressly bars the individual from shipping, transporting, possessing, or receiving firearms. *Id.* § 921(a)(33)(B)(ii).

S.Ct. 1591, 1596, 104 L.Ed.2d 18 (1989). No doubt is voiced here as to the legitimacy of the purpose served by the statute—protecting the public (and in particular the potential victims of domestic violence) from the grievous harm that firearms can inflict when placed in the wrong hands. *See Dickerson v. New Banner Institute, Inc.*, 460 U.S. 103, 118–19, 103 S.Ct. 986, 995, 74 L.Ed.2d 845 (1983); *Baer v. City of Wauwatosa*, 716 F.2d 1117, 1123 (7th Cir. 1983). The sole issue posed is whether this particular firearms ban rationally serves that interest. We need only be satisfied that there are " 'plausible reasons' " for the classification in question in order to sustain it. *F.C.C. v. Beach Communications, Inc.*, 508 U.S. 307, 313–14, 113 S.Ct. 2096, 2101, 124 L.Ed.2d 211 (1993), quoting *United States R.R. Retirement Bd. v. Fritz*, 449 U.S. 166, 179, 101 S.Ct. 453, 461, 66 L.Ed.2d 368 (1980).

The rationale for keeping guns out of the hands of those convicted of domestic violence crimes is eminently reasonable. Persons convicted of such offenses have, by definition, already employed violence against their domestic partners on one or more occasions. Congress could reasonably believe that such individuals may resort to violence again, and that in the event they do, access to a firearm would increase the risk that they might do grave harm, particularly to the members of their household who have fallen victim to their violent acts before. *See National Ass'n of Government Employees, Inc. v. Barrett*, 968 F.Supp. 1564, 1573 (N.D.Ga.1997) ("The court does not doubt that limiting the ability of a domestic violence misdemeanant to possess a firearm is reasonably related to Congress' purpose of protecting public safety by keeping firearms out of the hands of potentially dangerous or irresponsible persons."), *aff'd. and adopted by Hiley v. Barrett*, 155 F.3d 1276 (11th Cir. 1998); *Gillespie v. City of Indianapolis*, 13

F.Supp.2d 811, 824 (S.D.Ind.1998) (Barker, C.J.), *appeal pending* (No. 98–2691). In fact, the legislative history reflects precisely this concern. The sponsor of the legislation, Senator Frank Lautenberg, noted that "the presence of a gun dramatically increases the likelihood that domestic violence will escalate into murder." 142 Cong. Rec. S11227 (daily ed. Sept. 25, 1996).[3]

Lewitzke's observation that the ban applies to anyone convicted of domestic violence, no matter how long ago, does not undermine the validity of the statute. The legislature is entitled to handle the problems it confronts with "rough accommodations" where fundamental rights and suspect classes are not concerned. *Dandridge v. Williams*, 397 U.S. 471, 485, 90 S.Ct. 1153, 1161, 25 L.Ed.2d 491 (1970), quoting *Metropolis Theater Co. v. City of Chicago*, 228 U.S. 61, 69, 33 S.Ct. 441, 443, 57 L.Ed. 730 (1913); *see Listle v. Milwaukee County*, 138 F.3d 1155, 1158–59 (7th Cir.1998). Drawing the line more finely here is by no means an easy task—at what point, exactly, a domestic violence conviction becomes too old to reflect an individual's propensity to violence is not a question that even Lewitzke attempts to answer. Distinctions of this type are for lawmakers, rather than judges, to make. *See Hawker v. New York*, 170 U.S. 189, 197, 18 S.Ct. 573, 576, 42 L.Ed. 1002 (1898). Arguments focused on the relevance of particular types of convictions have therefore failed uniformly. *See, e.g., Lewis v. United States*, 445 U.S. 55, 66, 100 S.Ct. 915, 921, 63 L.Ed.2d 198 (1980) ("Congress could rationally conclude that any felony conviction, even an allegedly invalid one, is a sufficient basis on which to prohibit the possession of a firearm."); *Dickerson*, 460 U.S. at 120, 103 S.Ct. at 996 (expungement of prior state felony did not remove person from felon-in-possession ban: Congress used state conviction to trigger firearms

---

**3.** *See also, e.g.,* James E. Bailey et al., *Risk factors for violent death of women in the home,* 157 Archives of Internal Medicine 777 (1997); Arthur L. Kellerman et al., *Gun ownership as a risk factor for homicide in the home,* 329 New England Journal of Medicine 1084 (1993); Linda E. Saltzman et al., *Weapon involvement and injury outcomes in family and intimate assaults,* 22 Journal of American Medical Ass'n 3043 (1992).

disabilities not because it "wanted to tie those disabilities to the intricacies of state law, but because such convictions provide a convenient, although somewhat inexact, way of identifying 'especially risky people' "), quoting *United States v. Bass*, 404 U.S. 336, 345, 92 S.Ct. 515, 521, 30 L.Ed.2d 488 (1971); *United States v. McKenzie*, 99 F.3d 813, 818–20 (7th Cir. 1996).

■ It may also be, as Lewitzke ·suggests, that persons convicted of other sorts of misdemeanors pose a danger to society if armed, but neither does that possibility cast doubt upon the validity of the statute. Congress is free to "take one step at a time, addressing itself to the phase of the problem which seems most acute to the legislative mind." *Williamson v. Lee Optical of Oklahoma, Inc.*, 348 U.S. 483, 489, 75 S.Ct. 461, 465, 99 L.Ed. 563 (1955); *see also F.C.C. v. Beach Communications, Inc., supra*, 508 U.S. at 316, 113 S.Ct. at 2102. For a legislature concerned about the harm that may befall victims of domestic violence from firearms, persons already convicted of domestic violence are a logical starting, if not ending, point. *See Hawker*, 170 U.S. at 195–96, 18 S.Ct. at 576. As we have pointed out, by definition, those convicted of domestic violence offenses have already harmed their domestic partners in some fashion. It certainly would not be irrational for Congress to conclude that these individuals pose the most acute danger of turning a gun on a family member.[4]

4. In his reply brief, Lewitzke suggests that it is anomalous to premise a firearms disability upon a misdemeanor conviction because, as he interprets Wisconsin law, a pardon is available for felonies alone in that State. Thus, although a person convicted of a felony in Wisconsin has the opportunity to seek a pardon and the restoration of his ability to carry a firearm, one convicted of a misdemeanor does not. We typically do not consider arguments raised for the first time in the appellant's reply brief, *e.g.*, *United States v. Lezine*, 166 F.3d 895, 904 (7th Cir.1999), and we see no reason why we ought to do so here. We do point out, however, that the asserted anomaly is one that stems from state rather than federal law. *See United States v. Smith*, 171 F.3d 617, 624–26 (8th Cir.1999); *National Ass'n of Government Employees, Inc. v. Barrett, supra*, 968 F.Supp. at 1574–75; *see also McKenzie*, 99 F.3d at 819; *United States v. Weatherford*, 471 F.2d 47, 51–52 (7th Cir. 1972), *cert. denied*, 411 U.S. 972, 93 S.Ct. 2144, 36 L.Ed.2d 695 (1973).

Lewitzke also argues for the first time in his reply brief that the statute is irrational for the reasons articulated in *Fraternal Order of Police v. United States*, 152 F.3d 998 (D.C.Cir. 1998) ("*F.O.P. I*"), *reh'g granted*, 159 F.3d 1362 (D.C.Cir.1998), *on reh'g*, 173 F.3d 898 (D.C.Cir.1999) ("*F.O.P. II*"). That case is largely irrelevant here, however. What concerned our colleagues in the District of Columbia Circuit were the provisions of 18 U.S.C. § 925(a)(1). That section of the Gun Control Act exempts state and federal agencies from most of the firearms disabilities specified in the Act. This "public interest" exemption frees members of the armed forces and law enforcement agencies who might otherwise be prohibited from carrying firearms to do so in connection with their public responsibilities. However, the exemption does not extend to the firearms disability imposed by section 922(g)(9). Consequently, although a person with a prior felony conviction might be eligible to carry a gun in connection with federal or state employment notwithstanding the ˙felon-in-possession ban in section 922(g)(1), a person convicted of a· domestic violence misdemeanor would not be. *F.O.P. I* deemed this disparity irrational. 152 F.3d at 1002–04. However, the panel which heard *F.O.P. I* subsequently granted the government's petition for rehearing and ordered supplemental briefing and argument on the question; and on rehearing the court concluded that the felon/ misdemeanant distinction is, in fact, rational. *F.O.P. II*, 173 F.3d at 904–05. The District of Columbia Circuit has thus abandoned the reasoning that Lewitzke cites. But even that now-superseded reasoning would not call Lewitzke's conviction into doubt. The remedy that the court found appropriate in *F.O.P. I* was to deem section 925 unconstitutional insofar as it purports to withhold the public interest exemption from persons convicted of domestic violence misdemeanors; the firearms disability imposed by section 922(g)(9) was otherwise left intact. 152 F.3d at 1004. Consequently, *F.O.P. I* itself holds out no prospect of relief to Lewitzke, because his possession of firearms was for wholly private purposes and section 925 would, as a result, have no bearing on the circumstances underlying his conviction. For that reason, the disparity cited by *F.O.P. I* is not one for Lewitzke to pursue. *See United States v. Jester, supra*, 139 F.3d at 1172.

### B.

 The firearms offense provision of the Sentencing Guidelines specifies a reduced base offense level of 6 "[i]f the defendant ... possessed all ammunition and firearms solely for lawful sporting purposes or collection, and did not unlawfully discharge or otherwise unlawfully use such firearms or ammunition...." U.S.S.G. § 2K2.1(b)(2). Whether the defendant qualifies for this reduction turns upon the "[r]elevant surrounding circumstances includ[ing] the number and type of firearms, the amount and type of ammunition, the location and circumstances of possession and actual use, the nature of the defendant's criminal history (*e.g.*, prior convictions for offenses involving firearms), and the extent to which possession was restricted by local law." *Id.* (comment.) (n.10). Target shooting qualifies as a sporting purpose for purposes of the guideline, *United States v. Bossinger*, 12 F.3d 28, 29 (3d Cir.1993), and Lewitzke maintains that he is entitled to the reduced base offense level because each of the six firearms he was charged with possessing was used solely for this purpose. He bears the burden of proof on that point. *United States v. Gresso*, 24 F.3d 879, 880 (7th Cir.1994).

 Judge Crabb concluded that the "sporting use" provision did not apply. The judge was not persuaded that two of the weapons seized from Lewitzke's home—a Czechoslovakian Tokarev semi-automatic pistol, and a Phoenix Arms, Raven model .25 caliber semi-automatic pistol—were in fact used for target practice, as Lewitzke maintained. Agent Lawroski had opined that the Tokarev pistol is a military weapon, and that the Raven is a short-barreled pistol typically intended for concealment. See R. 95 ¶ 30.[5] Judge Crabb accepted the notion that these types of firearms are not generally used for sporting purposes (R. 100 at 25), although she nonetheless left room for the possibility that Lewitzke had used them for target practice alone (*id.* at 15, 25). But, in light of the locations in which the two weapons had been found, she was not convinced that they had in fact been used solely for sporting purposes. The fully-loaded Raven was found along with two extra magazines of ammunition in a bathroom closet, behind some sheets and towels. The loaded Tokarev, also with an extra magazine, was found in a bed in the attic bedroom, stuck between the mattress and box spring. The judge remarked:

> It is hard to reconcile the location of the guns with using them for target practice on any sort of regular basis. It seems more likely that they were there for some other purpose which would be illegal.

*Id.* at 30. The district court's determination of the use to which the firearms were put constitutes a finding of fact which we review for clear error. 18 U.S.C. § 3742(e); *e.g., United States v. Cobblah*, 118 F.3d 549, 550 (7th Cir.), *cert. denied,* —— U.S. ——, 118 S.Ct. 638, 139 L.Ed.2d 616 (1997).

Lewitzke suggests that the district court's finding cannot stand in light of the undisputed evidence that the only use to which guns were put in the Lewitzke household was target practice. He acknowledges that the court expressly discredited the pertinent trial testimony of two defense witnesses, Keith Lewitzke and Robert Barnetzke.[6] But these were not the only two witnesses who testified as to

---

**5.** Agent Lawroski's opinion is summarized in the Pre–Sentence Report. R. 95 ¶ 30. The government represented at sentencing that Lawroski was prepared to testify consistently with the views attributed to him by that PSR, but the defense accepted the PSR as adequate evidence of Lawroski's opinion. R. 100 at 24–25.

**6.** The thrust of these two witnesses' testimony was that neither the Tokarev nor the Raven pistol belonged to Lewitzke and that he did not really "possess" the weapons notwithstanding the fact that they were found in his home. Lewitzke's brother Keith testified at trial that he had sold the Raven pistol to Kirk in 1993, but that Kirk had returned the gun to him in January 1994 because it was not working properly. Keith testified that he subsequently took the gun with him to the defendant's home with the intent to test it on the backyard firing range to determine what was wrong. After arriving at Kirk's house, however, he found himself in urgent need of the

the target shooting that regularly took place in Lewitzke's backyard. Debra Havlovic (Lewitzke's companion) and John Clark, the chief executive officer of the company that employed Lewitzke, testified similarly, and the district court made no finding as to their credibility.

Lewitzke also seizes upon the district court's observation that the Tokarev and Raven pistols were likely kept for some purpose other than sport, "which would be illegal." R. 100 at 30. The court made no finding as to what illicit purpose the guns served, he emphasizes, and in fact there is no evidence in the record suggesting that the guns were used for criminal activity. The fact that guns and ammunition were strewn erratically throughout the house may suggest that he was a sloppy bachelor, Lewitzke concedes, but nothing more.

We find no clear error in Judge Crabb's finding, however. The emphasis that Lewitzke places on the lack of evidence that the guns were used for some purpose other than target shooting overlooks the essential point that it is *he*, not the government, who bears the burden of proof on this point. Simply put, the district judge did not find the evidence he presented sufficient to prove that two of the guns— the Tokarev and the Raven—were used solely for sporting purposes. To whatever extent the testimony of defense witnesses may have established that Lewitzke and/or his friends and family generally used guns for target practice, the placement of these particular guns—one behind towels and sheets in a bathroom closet, the other beneath a mattress in the attic bedroom— suggested to the judge that they were not used for sport. We detect nothing unreasonable about that inference. Why would guns used solely for sport be placed— seemingly hidden—in such locations? Lewitzke himself offers us no answer. Instead he decries the absence of evidence that the guns were used for nefarious purposes. Again, however, it was not the government's obligation to prove that the guns were possessed for some reason other than sport. Insofar as Lewitzke focuses upon the district court's remark as to the apparently illegal purpose of the weapons, he reads too much into the court's words. The district judge remarked simply that she believed it likely that the guns were present for some purpose other than sport, "which would be illegal." R. 100 at 30. We believe this was simply another way of saying that if Lewitzke did not possess the guns for sporting purposes alone, then his possession would not be sanctioned by the "sporting use" provision of the guidelines.[7]

---

restroom. He purportedly ran to the bathroom, put the weapon down "in the first handy spot," and simply forgot about the gun when he left. R. 96 at 145–47, 159. Where exactly he had left the gun he could not recall on the witness stand. *Id.* Robert Barnetzke claimed ownership of the Tokarev pistol. Barnetzke claimed that he purchased the weapon from Keith Lewitzke and had taken it to Lewitzke's home in 1995 to fire it on the shooting range. Before leaving the house to go out with other individuals, he changed clothes in the attic bedroom. Not wanting to take the gun with him and not wishing to leave it in the open, he slid it underneath the upper mattress on the bed without saying anything to Lewitzke and (like Lewitzke's brother) promptly forgot about it. *Id.* at 192– 94, 203–04. On cross-examination, Barnetzke admitted that in all likelihood he had also taken a rifle to Lewitzke's home on that day and used it, and that his normal practice would have been to return the rifle to his van when he was finished shooting. *Id.* at 202.

Debra Havlovic, Lewitzke's companion, testified that she had occasionally slept in the attic bedroom and had even changed the sheets on the bed, but yet had never noticed the firearm. *Id.* at 182–83.

In finding that these two guns should be attributed to Lewitzke for sentencing purposes along with the other four discovered in his home, Judge Crabb found Barnetzke's testimony to be "wholly incredible" (R. 100 at 29)—"as blatant an example of false testimony" as she had seen *(id.)*. The testimony of Lewitzke's brother struck her as "equally preposterous." *Id.*

7. Of course, neither the statute nor the guideline actually permits someone convicted of a domestic violence offense to possess a gun, even if he does so for sporting purposes alone. But by specifying a much lower base offense level in this circumstance, the guideline does significantly reduce the amount of prison time the defendant might serve for the possession.

### III.

For the reasons discussed, we AFFIRM Lewitzke's conviction and sentence.

If Lewitzke had been sentenced using the base offense level of 6 that section 2K2.1(b)(2) specifies, the sentencing range (based on a Criminal History Category of I) would have been zero to six months in prison. *See* U.S.S.G. Ch. 5, Pt. A.