**UNITED STATES of America,**
**Plaintiff,**

v.

**Michael BROWN, Defendant.**

**No. TH 02–19–CR–01 T/L.**

United States District Court,
S.D. Indiana,
Terre Haute Division.

Oct. 31, 2002.

Timothy M. Morrison, United States Attorney Office, Indianapolis, IN, for Plaintiff.

William E. Marsh, Indiana Federal Community Defenders, Indianapolis, IN, for Defendant.

## ENTRY ON DEFENDANT'S SECOND MOTION TO DISMISS

TINDER, District Judge.

The grand jury charged Defendant Michael Brown in a two-count Indictment. The prosecution is based on the statutory scheme that is the centerpiece of federal firearms regulation, the Gun Control Act of 1968, 18 U.S.C. §§ 921–930, and both charges arise from a 1996 amendment (the "Lautenberg Amendment") to that statutory scheme. The Lautenberg Amendment added domestic violence misdemeanants to the list of persons who are prohibited from possessing or receiving firearms which have an interstate commerce nexus. Count One of the Indictment relates to the purchase of such a firearm (a Smith & Wesson .38 caliber pistol) in September of 2001. This count alleges that Mr. Brown committed a violation of 18 U.S.C. § 922(a)(6) by knowingly providing false information in connection with the purchase of the firearm on an ATF form 4473 by answering "No" to a question asking whether he had a prior conviction for a misdemeanor crime of domestic violence. Count Two of the Indictment charges Mr. Brown with possession of nine other firearms after having been convicted of a misdemeanor crime of domestic violence, an infringement of 18 U.S.C. § 922(g)(9). The Defendant moves for dismissal of both counts pursuant to Federal Rule of Criminal Procedure 12(b). This entry will first discuss the factual predicate for the motion and will then analyze the application of the law to the facts.

### I. Discussion

On June 7,1993, Mr. Brown pled guilty to a misdemeanor charge of Battery under Indiana law, the predicate offense for his federal Indictment.[1] He was sentenced to a one year term in jail, suspended, with the exception of thirty days and a one year term of probation which included six months home detention and counseling.

---

1. Both the government and the Defendant agree to the facts discussed in this entry, which were derived from a court order issued by the Honorable Earl M. Dowd, Senior Judge of the Parke County, Indiana Circuit Court on June 7, 1993 (a copy of which was attached to the Defendant's motion) and a transcript of the sentencing hearing he held on that date (a copy of which was attached to the government's response to a previous motion to dismiss filed by the Defendant). The Defendant concedes, for purposes of this motion, that his 1993 battery conviction would qualify as a misdemeanor crime of domestic violence, except for the exemption upon which he bases his motion. An evidentiary hearing was not necessary because the parties agree to these facts, and the nature of the motion allows the Defendant's claim to be addressed on a pretrial motion to dismiss rather than as a defense that must be raised at trial.

(Def.'s Br., Ct. Order.) As of the date of the sentencing, he had already served three days of incarceration, and under an Indiana sentencing credit formula (not relevant to the issues presented by this motion), this left twelve additional days of incarceration for him to serve. (Sentencing Tr. at 11.) Judge Dowd allowed Mr. Brown to serve that time on an intermittent basis on his days off from work.

The Defendant argues that he is not subject to the firearms disability imposed by 18 U.S.C. § 922(g)(9) because his prior conviction does not meet the definition of a misdemeanor crime of domestic violence as provided in 18 U.S.C. § 922(a)(33)(B)(ii). This statute exempts from its scope misdemeanants whose civil rights have been restored, and Mr. Brown contends he falls into that category.[2] In response, the government denies the Defendant suffered a deprivation of his civil rights on account of his misdemeanor conviction, and so is ineligible for the civil rights restoration exception.

■ The determination of the Defendant's motion depends on the interplay of federal and Indiana state law. It appears that this challenge is a matter of first impression, and the evaluation of it is done cautiously in light of the important policies implicit in the Lautenberg Amendment. The federal and state statutes involved in this question present a murky essence, but in the end, appear to this court to lead to a clear, but somewhat surprising, result.

The court begins with the relevant exception to a misdemeanor crime of domestic violence contained in 18 U.S.C. § 921(a)(33)(B)(ii):

A person shall not be considered to have been convicted of such an offense [a misdemeanor crime of domestic violence] for purposes of this chapter if the conviction has been expunged or set aside, or is an offense for which the person has been pardoned or has had his civil rights restored (if the law of the applicable jurisdiction provides for the loss of civil rights under such an offense) unless the pardon, expungement, or restoration of civil rights expressly provides that the person may not ship, transport, possess or receive firearms.

As the few other courts to have construed this section of the Lautenberg Amendment have noted, the statutory language implies an awareness on the part of Congress that while some states strip persons of their civil rights for some types of domestic violence misdemeanors, this practice is not universal.[3] *United States v. Wegrzyn*, 305

---

**2.** Courts have uniformly held that the civil rights referenced in 18 U.S.C. § 921(a)(33)(B)(ii), as with those in its sister provision, *see* 18 U.S.C. § 921(a)(20) (making it a crime for felons to possess firearms unless their civil rights have been restored), denote the core cluster of the rights to vote, hold public office, and serve on a jury. *See United States v. McKinley*, 23 F.3d 181, 183 (7th Cir.1994); *United States v. Keeney*, 241 F.3d 1040, 1044 (8th Cir.2001).

**3.** Just how common or uncommon is difficult to say. At least the chief sponsor of the legislation, Senator Lautenberg, thought that few states deprive misdemeanants of their civil rights. "Loss of these rights generally does not flow from a misdemeanor conviction, and

so this language [exempting misdemeanants whose civil rights have been restored] is probably irrelevant to most, if not all, of those offenders covered because of the new ban[.]" 142 Cong. Rec. S11877–78 (1996) (statement of Senator Lautenberg). The temporary suspension of the right to vote or serve on a jury pursuant to a misdemeanor conviction may be more prevalent than Senator Lautenberg believed, however, especially where jail time is involved. While the government quotes the District of Columbia Circuit as speculating that "[s]o far as we know, no state responds to a domestic violence misdemeanor conviction by revoking the right to vote, hold office or serve on a jury," that statement occurs in a vacated opinion and does not appear in the superseding opinion. *Fraternal Order of Po-*

F.3d 593, 2002 WL 31190150, at 593–96 n. 3 (6th Cir.2002). At the same time, Congress intended to give the states a measure of influence over the coverage of the federal law through control over their own laws governing forfeiture and restoration of a misdemeanant's civil rights. *See United States v. Smith*, 171 F.3d 617, 625 (8th Cir.1999).

The statute thus directs the court to ascertain whether, under Indiana law, the Defendant has had his civil rights restored.[4] As the parenthetical phrase in the statute suggests, and logic would imply, restoration of civil rights can only occur in those jurisdictions which revoke these rights in the first place.

The question, then, is whether Indiana law first strips persons of, and later restores back to them, either their right to vote, serve on a jury, or hold public office upon conviction of a misdemeanor offense of domestic violence. The Defendant argues that it does and points to Indiana election laws to support this assertion. Indiana Code section 3–7–13–4 provides

that a person convicted of a crime and imprisoned upon conviction is "deprived of the right of suffrage by the General Assembly pursuant to Article 2, Section 8 of the Constitution of the State of Indiana." The right to vote is reinstated by Indiana Code section 3–7–13–6: "[A] person who is . . . . [n]ot otherwise imprisoned or subject to lawful detention . . . is eligible to register and vote." Accordingly, under these provisions Mr. Brown lost his right to vote during his imprisonment and regained it once his sentence was served.[5] Similarly, Indiana law disqualifies a person from jury service if "(4) The person is under a sentence imposed for an offense." Ind.Code § 33–4–5–7(b). The Defendant was accordingly barred from jury service until the expiration of his sentence,[6] at which point he no longer fit the definition of persons ineligible to serve on a jury. Thus, by implication, this right was restored to him. *See Hampton v. United States*, 191 F.3d 695, 699 (6th Cir.1999) (automatic restoration of civil rights upon completion of sentence satisfies restoration

---

*lice v. United States*, 152 F.3d 998, 1004 (D.C.Cir.1998), *vacated*, 173 F.3d 898 (D.C.Cir.1999). In any event, the court need only concern itself with the civil rights consequences of such a conviction in the State of Indiana.

4. The Defendant does not contend that he received a pardon.

5. Indiana law also restricts voting rights of convicted and imprisoned misdemeanants (and felons) in an indirect way by preventing their ability to register to vote, a threshold requirement for exercising the right to vote. *See* Ind.Code § 3–7–13–4(b). The right to register is reinstated immediately upon release from imprisonment. *See* Ind.Code § 3–7–13–5. Though not argued, this indirect method of affecting voting rights may support the Defendant's assertion that his voting civil right was deprived and restored as a result of his conviction. Moreover, this parallel treatment of voter registration confirms ·that Indiana law disenfranchises persons solely on

the basis of incarceration, regardless of the classification of the offense as infamous or not. *See infra* at 10–11.

6. At one point in its brief, the government asserts that a person loses his right to serve on a jury in Indiana "only as a result of incarceration." (Pl.'s Br. at 8.) The statute, however, uses the words "under a sentence imposed for an offense." During oral argument on this motion, counsel for the government recognized that the portion of his brief just cited is a misstatement, and that the more correct interpretation of the statute is contained on page 4 of the brief, which acknowledges that a person's service of a sentence of incarceration *or* probation precludes that person from jury service during the sentence. On the plain meaning of the phrase "under a sentence," a person under *any* sentence—not just incarceration—would fall under the ban on jury service. The court thus accepts the Defendant's assertion that he was ineligible to serve on a jury during his term of probation. (Def.'s Br. at 2.)

clause of Lautenberg Amendment); *United States v. Hall,* 20 F.3d 1066 (10th Cir. 1994) (same). It would appear that Mr. Brown has articulated plausible arguments that both his right to vote and right to serve on a jury were lost and later restored, in which case he would qualify for the civil rights restoration exception. Nonetheless, serious consideration must be given to the government's counter arguments.

### A. *Right to Vote*

The government responds that a more careful reading of Indiana law and its interaction with federal law leads to the opposite conclusion as to both the right to vote and serve on a jury. The court first considers the government's argument concerning the right to vote. In this regard, the provision of the Indiana Code mandating the disenfranchisement of prisoners, Indiana Code section 3–7–13–4, cites to Article 2, Section 8 of the Indiana Constitution, which reads: "The General Assembly shall have the power to deprive of the right of suffrage, and to render ineligible, any person convicted of an infamous crime." Ind. Const. art. II, § 8. An "infamous crime," moreover, is one punishable for a "term of years" in prison, *see Taylor v. State Election Bd. of the State of Ind.,* 616 N.E.2d 380, 385 (Ind.Ct.App.1993), which means "more than one year," *Wilson v. Montgomery County Election Bd.,* 642 N.E.2d 258, 261 (Ind.Ct.App.1994). Such a crime is generally referred to as a felony. Mr. Brown's prior state offense was a Class A misdemeanor, for which the maximum penalty is a maximum of one year imprisonment. Ind.Code § 35–50–3–2. It is thus not an infamous crime.

The government's brief seems to argue that the state constitutional provision restricts the General Assembly's power of disenfranchisement to persons convicted of infamous crimes, thus, the General Assembly exceeded its constitutional authority by

prohibiting imprisoned misdemeanants, such as Mr. Brown, from voting. It was the court's impression from reading·the government's brief that it contended that the Indiana legislature could not lawfully divest the Defendant of his right of suffrage, and, as a result, his right to vote did not need to be restored to him by operation of law. At oral argument, counsel for the government backed somewhat away from this position, indicating that the argument about the Indiana constitutional provision was made not so much to assert the legislature's limited authority, but rather, to show that the legislature intended only to disenfranchise imprisoned felons. In other words, the constitutional reference in the disenfranchisement statute requires it to be construed as only applying to felons serving terms of imprisonment because the statute incorporates the constitution's specification of infamous crimes.

There are several flaws in these lines of argument. First, it is not clear that Indiana Code section 3–7–13–4, as written, contravenes the Indiana Constitution. No Indiana court has passed on the constitutionality of the statute. And, the Indiana General Assembly, unlike Congress, is not limited to certain enumerated powers, *see United States v. Lopez,* 514 U.S. 549, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995), but possesses general police powers, *see generally Cent. Union Tel. v. Indianapolis Tel. Co.,* 189 Ind. 210, 126 N.E. 628, 632 (1920) ("The state through its legislative department of government may pass all laws and regulations respecting the peace, the safety, the health, the happiness and general well-being of the people of the state [except as limited by] the express provisions of the state [and federal] Constitution[s]."). The state legislature therefore did not need a specific grant of power in order to pass a statute depriving prisoners of their right to vote. In fact, the Indiana legislature has promulgated an entire election

code regulating numerous aspects of voting, all done without a specific constitutional delegation of authority. Ind.Code tit. 3 (1998).

Instead, the issue is whether, in expressly empowering the General Assembly to disenfranchise persons convicted of an infamous crime, the Indiana Constitution meant to deny the General Assembly a similar power over misdemeanants. A plausible argument can be made that it did not. In referring to the Indiana Constitution, the statutory text uses the phrase "pursuant to," which may carry the meaning of "in accordance with," or "in conformance to." *Black's Law Dictionary* (6th ed.1990). By indicating that disenfranchisement is done "pursuant to" Article 2, Section 8 of the Indiana Constitution, the statute could be read as indicating that the denial of suffrage of *all* persons convicted and incarcerated is effected "in accordance with," or "in conformance to" the disenfranchisement of convicted felons explicitly contemplated in the constitution. This reading makes more sense than one viewing the constitutional reference as a citation of authority, because such authority is superfluous to a legislature endowed with general police powers. It also preserves the constitutionality of the temporary disenfranchisement of prisoners, an eminently reasonable practice.[7] In light of these ambiguities, the court believes that resolution of this difficult point of state constitutional construction is best left to the Indiana courts, and declines the government's implicit invitation to hold the state law depriving misdemeanants of the right to vote during their terms of incarceration unconstitutional.

But even if the court determined that the General Assembly had run afoul of the state constitution in passing Indiana Code section 3–7–13–4, as a matter of fact, Mr. Brown was deprived of his right to vote. As the Defendant argues, the disenfranchisement law is facially valid and unambiguous, and it applies to all prisoners regardless of the type of offense. No Indiana or federal court has held the statute unconstitutional, and until then, Indiana officials remain under a continued obligation to enforce it as written. *Cf. Saloom v. Holder,* 158 Ind.App. 177, 304 N.E.2d 217, 220 (1973) ("Even an unconstitutional Act has the semblance of valid law until invalidated. It is entirely logical that public officials, acting in good faith under or pursuant to such legislation, are afforded such 'color of law' as will protect them from personal liability."). The statute was accordingly enforced as to Mr. Brown, who, as a consequence, lost his right to vote during his albeit brief term of incarceration.

Finally, with respect to the government's assertion of a limited intent on the part of the legislature, the statutory reference to the Indiana Constitution is not readily understood as language of limitation or incorporation. The language of the statute is explicit and clear—persons who are both convicted and imprisoned cannot vote. Ind.Code § 3–7–13–4. If that is not clear enough, Indiana law also explicitly states that persons *not* imprisoned or lawfully detained can vote. Ind. Code § 3–7–13–6. Had the General Assembly intended to safeguard an incarcerated misdemeanant's right to vote by its reference to the state constitution, it would have included this class of persons in its definition of those eligible to register and vote in Indiana Code section 3–7–13–6. Instead, that statute accords the

---

7. One can imagine the awkwardness of a jailor being required to transport a group of convicted misdemeanant prisoners to a polling place, or the absurdity of a cell block of such prisoners voting as a block through absentee ballots to challenge their jailer's candidacy for re-election as county sheriff.

right of suffrage to those on probation, parole, subject to home detention, or placed in a community corrections program—but not to those imprisoned. A fair reading of this statutory scheme leads to the conclusion that convicted misdemeanants are treated identically with convicted felons—neither can vote while imprisoned (Indiana Code section 3–7–13–4) and both can vote immediately upon their release from incarceration (Indiana Code section 3–7–13–6). In other words, Indiana law chooses to deny suffrage to those serving a sentence of incarceration. A careful reading of the re-enfranchisement statute also makes it clear that Mr. Brown's loss of voting privileges came to an end as soon as the incarceration portion of his sentence was completed. His voting rights were fully available to him even during his home detention, but not while he was in jail. *See* Ind.Code § 3–7–13–6. He thus qualifies as a person whose civil rights have been restored, and is exempt from the firearms disability imposed by the Lautenberg Amendment.

### B. *Right to Serve on a Jury*

The government also argues that Mr. Brown is not entitled to benefit from the civil rights restoration exception because Indiana law does not deprive persons of the right to serve on a jury in the requisite way. The government concedes that "[d]uring a person's incarceration or probation pursuant to Indiana's misdemeanor domestic violence law, that person cannot serve on a jury." (Pl.'s Br. at 4.) However, the government urges on this court a technical distinction supposedly found in 18 U.S.C. § 921(a)(33)(B)(ii), specifically in the phrase the "loss of civil rights under such an offense." The inclusion of the word "under," on the government's interpretation, restricts the loss of civil rights envisaged in the federal statute to that which follows as a result of the misdemeanor conviction rather than as a result of incarceration or other sentence incidental to conviction. Indiana Code section 33–4–5–7(b)(4), by contrast, disqualifies from jury service a person "under a sentence imposed for an offense." The law thus renders a misdemeanant ineligible to serve on a jury on account of imposition of a sentence, instead of the conviction itself. Because the Indiana juror disqualification statute is so worded, the government claims misdemeanants whose right to serve on a jury was subject to temporary suspension cannot later avail themselves of the civil rights restoration exception once that right is restored.[8]

The court is unpersuaded by this distinction. It has not been remarked by any of the few courts to have construed the Lautenberg Amendment. *See, e.g., United States v. Wegrzyn*, 305 F.3d 593, 594–96 n. 1 (6th Cir.2002) (finding Michigan law deprives misdemeanants of right to vote where statute says "A person who . . . has been legally convicted and sentenced for a crime for which the penalty imposed is confinement in jail or prison shall not vote[.]"). Moreover, it strains the ordinary meaning of language to hold that a person penalized as a consequence of a

---

8. The government supports its position with the Indiana Code's enumeration as a separate condition of juror disqualification that a person has had "rights revoked by reason of a felony conviction and the rights have not been restored." Ind.Code § 33–4–5–7(b)(6). The failure to mention any rights revoked by reason of a misdemeanor conviction is taken to mean that no such rights are thereby lost. However, that provision, added to the statute in 1998, is meant to cover the situation of a felon whose sentence has already been served, and thus who would not be subject to the restriction contained in (b)(4), but who is nonetheless under a continuing civil disability by reason of his felony conviction. It in no way implies that a misdemeanant still under a sentence is exempt from the blanket prohibition on jury service in (b)(4).

sentence justified solely by lawful conviction has not also been penalized "under" the offense of conviction. In addition, as a general matter, criminal statutes should be construed narrowly in favor of defendants. *See, e.g., United States v. Bass,* 404 U.S. 336, 347–348, 92 S.Ct. 515, 30 L.Ed.2d 488 (1971) (doubts resolved in favor of defendant); *Rewis v. United States,* 401 U.S. 808, 812, 91 S.Ct. 1056, 28 L.Ed.2d 493 (1971) ("And even if this lack of support were less apparent, ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity.") (citation omitted). Thus, the court concludes that Mr. Brown endured the loss of his right to serve on a jury during the course of his sentence, and regained that right upon its expiration. Consequently, he qualifies as a person whose civil rights have been restored, and is not subject to the disability imposed by 18 U.S.C. § 922(g)(9).[9]

### C. Congressional Intent

Finally, the government maintains that to find Mr. Brown eligible for the civil rights exception would allow this exception to swallow the rule barring domestic violence misdemeanants from possessing a firearm. For there is nothing unique about the Defendant in this respect—he pled guilty to a misdemeanor charge, and was sentenced to jail as well as a probationary term. If Mr. Brown may benefit from the civil rights restoration exemption, then so may others who are found guilty of misdemeanor domestic violence and sentenced under Indiana law.[10] It is surely contrary to the intent of Congress to exempt such a routine domestic violence misdemeanant from the reach of 18 U.S.C. § 922(g)(9). "Congress was concerned with .... preventing a known (from the fact of the misdemeanor conviction) domestic abuser from later using a firearm to inflict the next bout of abuse." *United States v. Smith,* 171 F.3d 617, 625 (1999).[11]

The court is well aware that dismissal of the Defendant's charges conflicts with the laudable congressional purposes behind this legislation. However, the court is obliged to apply the law as it is written. Congress' failure to successfully implement its full intent in writing a law does not give courts free rein to disregard the

**9.** The government further claims this court should reject the opinion in *United States v. Wegrzyn,* 106 F.Supp.2d 959, 962 (W.D.Mich. 2000), now affirmed on appeal, *United States v. Wegrzyn,* 305 F.3d 593, 594 (6th Cir.2002), holding that even those misdemeanants who have retained their civil rights all along—as the government claims of Mr. Brown—should be entitled to benefit from the restoration exemption.

As is evident from this entry, there is no need to discuss the *Wegrzyn* case, because that case applies to the situation where a misdemeanant never forfeited his civil rights to begin with, and that court's concern was to put such misdemeanants on equal footing with those who have lost their rights and later had them restored. *Wegrzyn,* at 594. Whatever the merit of that decision, it is inapplicable here, for the Defendant in this case did in fact have his civil rights stripped and reinstated.

**10.** Specifically, every domestic violence misdemeanant convicted in Indiana who receives

a sentence would be eligible for the exception upon completion of that sentence, except where an express provision attached to a civil rights restoration proscribes subsequent gun possession. *See* 18 U.S.C. § 921(a)(33)(B)(ii). That leaves only those domestic violence misdemeanants who do not receive sentences (if that is possible under Indiana law) as potentially covered by the law, depending on whether the holding in *Wegrzyn* is adopted by the Seventh Circuit, an issue not presented by the case at bar.

**11.** The government cites to the legislative history of the Lautenberg Amendment to provide evidence of congressional intent. (Pl.'s Br. at 5–6.) That citation is largely unnecessary; Congress' belief in the potential danger of permitting domestic violence misdemeanants to possess firearms is obvious from the nature of the prohibition.

plain meaning of the resultant statute, especially where to do so would subject a person to criminal penalties. "The fact that Congress may not have foreseen all of the consequences of a statutory enactment is not a sufficient reason for refusing to give effect to its plain meaning." *Union Bank v. Wolas,* 502 U.S. 151, 158, 112 S.Ct. 527, 116 L.Ed.2d 514 (1991); *see also McBoyle v. United States,* 283 U.S. 25, 27, 51 S.Ct. 340, 75 L.Ed. 816 (1931) ("[A] fair warning should be given to the world in language the common world will understand, of what the law intends to do if a certain line is passed. To make the warning fair, so far as possible the line should be clear.") (Holmes, J.).

In enacting the Lautenberg Amendment, Congress reserved authority for each of the states to deal with the question of whether domestic violence misdemeanants should be able to possess firearms. There is no indication that the Indiana legislature affirmatively chose to reward such violators with the benefits of this unusual exemption from the federal firearms regulatory scheme. Nonetheless, as of this point in time, it has not chosen to treat domestic violence misdemeanants any differently than other misdemeanants with respect to the deprivation and restoration of voting and jury service rights. This court cannot predict what will happen in the future, but it would not express any surprise if the subject is visited when that body meets.

■ As a final note, the government concedes that if the exemption of § 921(a)(33)(B)(ii) applies to defeat Count One, the same result applies to Count Two. That is an appropriate concession because under § 922(a)(6), the Defendant's statement on the 4473 form in connection with the .38 purchase was not false. The exemption means that, in fact, the Defendant had not been convicted of a misdemeanor crime of domestic violence, as defined by the federal firearms regulatory scheme. Another way to look at this is that his denial of conviction, even if false, was not "material" to the sale of a firearm under § 922(a)(6).

## II. Conclusion

Government counsel suggested during oral argument that, at best, for the Defendant, he may have shown that his jury service right was impaired during his sentence, and that the deprivation and restoration of a single civil right should not be considered enough to qualify him for the exemption under § 921(a)(33)(B)(ii). The contention that this is a "de minimus" case does not need to be decided here because that is not this case. Mr. Brown lost both his right to vote (while incarcerated) and his right to serve on a jury (during his sentence), and both rights were subsequently restored. These are not minimal civil rights, and neither the deprivation nor restoration of them were illusory or fictional. For the reasons discussed above, the Defendant's motion to dismiss the indictment is **GRANTED**. A judgment will be entered accordingly.

### JUDGMENT

The court has found that the Defendant's Motion to Dismiss the Indictment should be **GRANTED**. There are no other charges pending against the Defendant in this case, so he is entitled to be discharged from this prosecution.

**IT IS NOW THEREFORE, ORDERED, ADJUDGED AND DECREED** that Counts One and Two of the Indictment are **DISMISSED** and the Defendant is **DISCHARGED** and is relieved from all conditions of pretrial release.