**FRATERNAL ORDER OF POLICE, Appellant,**

v.

**UNITED STATES of America, Appellee.**

No. 97–5304.

United States Court of Appeals, District of Columbia Circuit.

Argued Jan. 12, 1999.

Decided April 16, 1999.

---

Robert M. Loeb, Attorney, U.S. Department of Justice, argued the cause on rehearing for appellee. With him on the briefs were Frank W. Hunger, Assistant Attorney General, Wilma A. Lewis, U.S. Attorney, and Mark B. Stern, Attorney, U.S. Department of Justice.

William J. Friedman, IV, argued the cause and filed the answer brief on rehearing for appellant.

Donna F. Edwards was on the brief for amicus curiae The National Network to End Domestic Violence.

Before: WILLIAMS, GINSBURG and RANDOLPH, Circuit Judges.

Opinion for the Court filed by Circuit Judge STEPHEN F. WILLIAMS.

STEPHEN F. WILLIAMS, Circuit Judge:

In *Moldea v. New York Times Co.*, 22 F.3d 310, 311 (D.C.Cir.1994), at the outset of an opinion in which a panel on petition for rehearing abandoned its initial view, we quoted Justice Frankfurter's remark, "Wisdom too often never comes, and so one ought not to reject it merely because it comes late." *Henslee v. Union Planters Nat. Bank & Trust Co.*, 335 U.S. 595, 600,

69 S.Ct. 290, 93 L.Ed. 259 (1949) (Frankfurter, J., dissenting). It still seems good advice.

## I. Background

In *Fraternal Order of Police v. United States*, 152 F.3d 998 (D.C.Cir.1998) ("*FOP I*"), this panel addressed two provisions of the 1996 amendments to the Gun Control Act of 1968, 18 U.S.C. § 921 et seq. The first was § 922(g)(9), which adds domestic violence misdemeanants—"any person who has been convicted in any court of a misdemeanor crime of domestic violence"—to the list of those for whom it is unlawful to possess a firearm "in or affecting interstate commerce" or to receive a firearm that has been shipped in interstate or foreign commerce. Besides covering additional persons, Congress also amended a pre-existing exemption, § 925(a)(1), which nullified the Gun Control Act's disabilities for "any firearm ... issued for the use of ... any State or any department, agency, or political subdivision thereof"; Congress excluded the newly covered persons from the section's benefits. Thus, domestic violence misdemeanants, unique among persons forbidden to possess guns under the Act, are not allowed to possess even government-issued firearms.

The Fraternal Order of Police challenged the amendments on a variety of grounds, including the equal protection element of the Fifth Amendment's due process clause. See *Bolling v. Sharpe*, 347 U.S. 497, 500, 74 S.Ct. 693, 98 L.Ed. 884 (1954). We found such a violation, holding that the amendments failed "rational basis" review because of their harsher treatment of domestic violence misdemeanants as compared to domestic violence felons. See *id.* at 1002–03.

The United States petitioned for rehearing on two grounds: that FOP had not properly raised an argument based on the irrationality of the relative treatment of misdemeanants and felons, and that we were incorrect to find the difference irrational. We granted the petition, and re-quested briefing and heard oral argument on both points. See *Fraternal Order of Police v. United States*, 159 F.3d 1362 (1998).

We now determine that although it was likely improvident to address the felon-misdemeanant equal protection question in our original opinion, it has now become appropriate to do so. We also reverse our previous position and hold that the challenged provisions do satisfy rational basis review. This requires us to reach FOP's other arguments: that § 922(g)(9) violates due process by burdening the fundamental right to bear arms, that it is beyond Congress's power under the commerce clause, and that it violates the Tenth Amendment. We reject all these claims.

## II. Waiver of the felon-misdemeanant claim.

Although the felon-misdemeanant distinction was never the focus of FOP's arguments, the Order did raise it twice in this litigation: orally before the district court at the combined summary judgment/preliminary injunction hearing and in its reply brief here. After advancing FOP's principal equal protection argument—that it was irrational to focus on domestic violence misdemeanants to the exclusion of other misdemeanants—FOP's counsel said:

> The other strangeness about it is that, if you are convicted of a felony, you are a convicted serial killer ... you can be rearmed, or if you somehow become a police officer after your conviction, you can keep your gun, because you're a convicted felon. Fine. The exemption section still obtains with respect to felonies.
>
> So what's the rationality of, not only looking at one kind of misdemeanor instead of all violent misdemeanors, but leaving every felon able to be a law enforcement officer and carry a weapon in the public interest? I mean the

States may regulate that, but the Federal government isn't.

So if you looked just at the Federal enactment, it's irrational to say that convicted felons can be police officers and carry weapons, and people convicted of one kind of misdemeanor cannot.

March 7, 1997 Hr'g Tr. at 50–51. Neither the government nor the district court addressed the misdemeanant-felon distinction.

FOP's oral argument on the felon-misdemeanant distinction was enough to satisfy the general requirement that an issue on appeal be raised in the trial court. The government complains that it lost any "opportunity to make a record as to the relevant facts and legal arguments" because of FOP's timing in raising the issue below. Gov't Reh'g Br. at 4. But the government did not, as it could have, seek to submit a post-argument brief or supplemental affidavits on the felon-misdemeanant question. See Fed.R.Civ.P. 56(e) ("The court may permit [summary judgment] affidavits to be supplemented or opposed by depositions, answers to interrogatories, or further affidavits."). Furthermore, the issue presented is essentially a legal one, and the government has not identified in its rehearing petition or briefs any type of factual evidence it would have introduced if given the opportunity.

In any event, the District Court for the District of Columbia regularly considers arguments raised for the first time at oral argument in deciding dispositive motions. See *Joslin Co. v. Robinson Broadcasting Corp.*, 977 F.Supp. 491, 493 (D.D.C.1997) (motion to dismiss); *Jones v. WMATA*, 1997 WL 198114, at *1, n. 1, No. Civ. A. 95–2300–LFO (D.D.C. April 10, 1997) (summary judgment); *Richardson v. National Rifle Ass'n*, 871 F.Supp. 499, 501 (D.D.C.1994) (summary judgment). If the felon-misdemeanant issue had been properly briefed on appeal, it would have been proper for us to address it.

But FOP failed to raise the issue in its opening brief on appeal. Although two passages in that brief might be read in isolation as related to the felon-misdemeanant equal protection argument, context makes clear that neither one actually did so. The first vague allusion was merely ancillary to FOP's commerce clause argument, see FOP Br. at 34–35, and the second, though vague, plainly related solely to FOP's claim of irrational discrimination *among* misdemeanants, see FOP Br. 39–40. Unsurprisingly, the government did not address the felon-misdemeanant distinction in its brief.

FOP's reply brief, however, did raise it, saying, albeit in the context of its commerce clause argument, that "[t]his limited elimination of a long-standing exception is irrational.... Permitting a person convicted of a felony on a domestic partner to benefit from the exception but not a person convicted of a misdemeanor on a domestic partner serves no legitimate goal." FOP Reply Br. at 16.

■ Normally, because of the likely unfairness to parties and risk of improvident decisions, we would refuse to consider an argument that an appellant failed to raise before its reply brief. See, e.g., *Doolin Sec. Sav. Bank v. OTS*, 156 F.3d 190, 191 (D.C.Cir.1998); *McBride v. Merrell Dow & Pharms., Inc.*, 800 F.2d 1208, 1210–11 (D.C.Cir.1986). Here, however, the felon-misdemeanant issue was raised energetically by the court at oral argument (perhaps because, although defectively raised, it appeared comparatively straightforward), but the government, though responding on the merits, made no mention of FOP's waiver of the issue. Oral Arg. Tr. at 35–39. Accordingly, we think it was within the court's discretion to treat the government as having waived the waiver. See *United States v. Hollingsworth*, 27 F.3d 1196, 1203 (7th Cir.1994) (en banc); cf. *Ochran v. United States*, 117 F.3d 495, 503 (11th Cir.1997) (weighing "prejudice to the parties" and "interest of justice" in determining whether to treat government

as having waived appellant's failure to raise argument below).

That of course is not to say that affirmative exercise of the discretion was wise. We have already telegraphed that with the more complete briefing we see the issue as coming out the other way. In retrospect, it may well have been imprudent to address the merits on so thin an argumentative record.

Now, however, both parties have weighed in on the issue in considerable detail. The court has worked through it not once but twice. So there is no special risk of reaching an improvident decision; and, as the government has had (and taken) the opportunity to respond, the most important respect in which reaching the issue might have been "unfair" is also absent. One might also think it "unfair" in a relevant sense to be faced with the risk of losing a case on the basis of an argument that one's adversary failed to raise in the time and space allotted. But that seems weak here, as the government shares some of the responsibility for our having missed the procedural objection initially.

Thus, there is no bar to resolving the felon-misdemeanant issue at this stage. In addition, there is an affirmative reason for doing so: judicial economy. This panel's prior opinion highlighted the felon-misdemeanant issue; it will surely be raised again soon. The costs of now going forward being modest, and the potential benefit being at least the norm for any judicial decision, it makes little sense to drop the issue.

III. The rationality of the felon/misdemeanant distinction

■ The analysis of standing on this issue is unchanged from our prior opinion. 152 F.3d at 1001–02. On the merits, it is plain that §§ 922(g)(9) and 925(a)(1) impose a harsher sanction on domestic violence misdemeanants than on felons. Whereas gun possession by persons convicted of a crime punishable by at least one year of imprisonment is subject to § 925(a)(1)'s exemption for government-issued firearms, gun possession by domestic violence misdemeanants is not. See §§ 922(g)(1) & (9), 925(a)(1).

■ Such domestic violence misdemeanants are not a suspect class for equal protection analysis, and we assume for the purposes of this section that the regulation does not infringe a fundamental right. (In section IV we address and reject the contention that § 922(g)(9) has been shown on this record to infringe such a right.) Thus, the classification "must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." *FCC v. Beach Communications, Inc.*, 508 U.S. 307, 313, 113 S.Ct. 2096, 124 L.Ed.2d 211 (1993).

Treating misdemeanants more harshly than felons seems irrational in the conventional sense of that term. After all, "what is uniform and undisputed is that the presence of some aggravating circumstance (or perhaps the absence of a mitigating one) is necessary to establish a felony." *FOP I*, 152 F.3d at 1003. In the standard equal protection case the legislature is fully entitled to weigh one characteristic more heavily than another, even though the balance may seem baffling to the court. But here Congress has incorporated a set of classifications made by state legislators who clearly regarded the felons' conduct as calling for greater severity than the misdemeanants'—whether because of moral opprobrium, risk to society, or whatever criteria may have guided their judgment. Yet Congress inverted this adopted classification, imposing a lesser disability on the felons, whom the state legislators had singled out for more severe treatment. Thus the usual proposition that Congress is entitled to address a problem "one step at a time" is not self-evidently applicable. See *id.*

But on reflection it appears to us not unreasonable for Congress to believe that existing laws and practices adequately deal

with the problem of issuance of official firearms to felons but not to domestic violence misdemeanants—adequately at least in the sense of explaining how Congress might have found that as to felons the net benefit of federal prohibition (and non-exemption) fell below the net benefit of prohibition and non-exemption as to misdemeanants. Although state laws do not uniformly ban felons from possessing guns, as we observed in *FOP I*, see 152 F.3d at 1003, nonlegal restrictions such as formal and informal hiring practices may, as the government argues, prevent felons from being issued firearms covered by § 925(a)(1) in a large measure of the remaining cases. In the absence of evidence negating these propositions, they indicate that there is a reasonably "conceivable state of facts" under which it is rational to believe that the felon problem makes a weaker claim to federal involvement than the misdemeanant one. When the government is faced with a practical determination like this one, we are obliged to accept "rough," even "illogical," solutions with an "imperfect fit between means and ends." See *Heller v. Doe*, 509 U.S. 312, 321, 113 S.Ct. 2637, 125 L.Ed.2d 257 (1993).

We note that federal criminal prohibitions in areas traditionally left to the states always entail costs—such as loss of state capacity to experiment (and of others to learn from the experiments), some atrophy of state authority, and loss of the nuance possible where regulation is by governmental institutions closer to the local scene. Thus Congress's self-limitation here may reflect a legitimate accommodation of the inherent interest in minimizing the scope of potentially intrusive federal legislation. This parallels our observation in *Blount v. SEC*, 61 F.3d 938, 946 (D.C.Cir.1995), on the functions of underinclusiveness analysis in the First Amendment realm. It addresses whether the proffered state interest actually underlies the disputed law; once that is established, there is no occasion for any inquiry into whether some broader restriction on speech would more effectively advance the specified set of legislative aims.

We leave for another day the complex interpretive issues posed by the statutory provision relieving an offender of the disability where the underlying conviction has been expunged or set aside, or the offender pardoned, or where civil rights that have been revoked are restored. See 18 U.S.C. § 921(a)(33)(B)(ii); *FOP I*, 152 F.3d at 1003–04. The possible anomalies noted in our earlier opinion and in those of other courts have not been addressed in the briefs and their impact would appear to turn on a detailed analysis of applicable state law and its interaction with federal law.

■ Finally, we reaffirm the determination in our original opinion that a special focus on domestic violence misdemeanants, as opposed to other misdemeanants, was not irrational under the norms of equal protection jurisprudence. See *id.* at 1002–03.

## IV. Other constitutional claims

### A. Standing

■ In *FOP I* we found that FOP members who are chief law enforcement officers ("CLEOs") would have Article III standing to challenge §§ 922(g)(9) and 925(a)(1): the provisions injure the CLEOs because they prevent them from using officers affected by the ban in situations requiring firearms, and the injury is redressable by this court. *FOP I*, 152 F.3d at 1001–02. Further, FOP satisfied the standards of *Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333, 343, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977), for Article III standing—(1) CLEOs are among FOP's members, (2) the challenge is germane to its purpose, and (3) the CLEOs' participation as individuals is not necessary for disposition of the case—at least as to those claims for which the complaining CLEOs also have prudential standing.

In *FOP I* we raised the question whether a deficiency in prudential standing on

the part of members would translate, for the association, into a deficiency in Article III standing or into one in prudential standing. 152 F.3d at 1001 n. 1. As we found prudential standing for the CLEOs on the equal protection claim, in the end we didn't need to resolve the issue. But the analysis we used for prudential standing for the CLEOs depended on the claim's being one of equal protection, and so is unavailable for the issues now before us.

It is, however, permissible to reject a claim on the merits without having explicitly resolved the prudential standing issue. For one reason, as the Court has explained, overlap between the merits and prudential standing is sometimes so great as to make any distinction artificial. *Steel Co. v. Citizens for a Better Env.*, 523 U.S. 83, 118 S.Ct. 1003, 1013–14 n. 2, 140 L.Ed.2d 210 (1998). See also *George E. Warren Corp. v. EPA,* 164 F.3d 676 (D.C.Cir.1999). But we may proceed along this line only if our answer to the question left open in *FOP I* is that a failure in members' prudential standing constitutes only a failure in prudential standing for the association.

As we suggested in *FOP I* would be the case, that is our answer. Cases have treated the first *Washington Apple* requirement (that a member have standing) as entirely constitutional, see, e.g., *United Food & Comm'l Workers v. Brown Group,* 517 U.S. 544, 554–56, 116 S.Ct. 1529, 134 L.Ed.2d 758 (1996), but those cases did not confront the significance of a member's having constitutional but not prudential standing. Basically the first criterion appears simply to look through the associational veil to the member's interest; the second (germaneness to the association's purposes) aims at assuring proper representativeness and is thus needed to establish requisite adversariness, and the third

(absence of any need to have the members before the court) meets certain convenience considerations. *Id.* Because the association functions only as a transparency in relation to the requirement of a member's standing, we think the normal (qualified) excusability of addressing prudential standing is passed through to the association. Accordingly, we move on to the merits.

## B. Merits

*Substantive Due Process; Second Amendment*

■ FOP argues that § 922(g)(9) violates the substantive due process guarantee of the Fifth Amendment by "unnecessarily and irrationally burdening important individual interests in possession of a firearm in the public interest, in serving the communit[y], and in pursuing an established career." FOP Br. at 36. The second interest has clearly not attained the status of a fundamental right. As to the third, it is true that if government action against a particular person "precludes" him from pursuing his profession, that action can infringe a "liberty interest"; if so, the predicate procedures must satisfy due process requirements. See *Kartseva v. Department of State,* 37 F.3d 1524, 1529–30 (D.C.Cir.1994). But FOP's claim is that § 922(g)(9) violates "substantive" due process; yet it has failed to develop either a factual record or the legal standard for evaluating whether § 922(g)(9) burdens the liberty interest so deeply as to require even justification. Accordingly we turn directly to the claim arising from the Second Amendment.

■ First we note that on appeal FOP also raises an *independent* Second Amendment claim. But as it did not do so in the district court[1] we do not address it in that form. We must confess, however, that we

---

1. There FOP invoked the Second Amendment only as part of arguments that § 922(g)(9) violates the Tenth Amendment and the constitutional guarantees of substantive due process and equal protection. See Hearing Trans. at 47, 52 (Tenth Amendment); FOP Memo. in Support of Prel. Inj. at 15, 18 (equal protection and substantive due process); FOP Resp. and Reply at 15–16 (Tenth Amendment).

are mystified by the decision to advance a substantive due process claim based on an explicit Second Amendment right in preference to a simple assertion of the explicit right itself. It is not apparent how a claim might be strengthened by being tucked into the catch-all of substantive due process.

In any event, the claim obviously requires us to consider the Second Amendment right, on which the Supreme Court's guidance has been notoriously scant. The government argues that FOP's claim fails because FOP has not "alleg[ed], much less prov[en], that section 922(g)(9) has any relationship to the 'preservation or efficiency of a well regulated militia.'" Gov't Br. at 35 (quoting *United States v. Miller*, 307 U.S. 174, 178, 59 S.Ct. 816, 83 L.Ed. 1206 (1939)). Since *Miller* dealt with Congress's authority to prohibit ownership of short-barreled shotguns, FOP could have challenged the test's applicability by arguing that it serves only to separate weapons covered by the amendment from uncovered weapons. It did not do so, and we thus assume the test's applicability.

But we are not altogether clear what kind of "relationship"—or, to quote *Miller* more precisely, "reasonable relationship," *id.*—is called for here. This *Miller* test appears in some sense to invert the commercial speech test, which requires the government to show that legislation restricting such speech bears a reasonable relationship to some "legitimate" or "substantial" goal. See, e.g., *City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 416, 113 S.Ct. 1505, 123 L.Ed.2d 99 (1993); *Board of Trustees v. Fox*, 492 U.S. 469, 480, 109 S.Ct. 3028, 106 L.Ed.2d 388 (1989). We suppose *Miller* would be met by evidence supporting a finding that the disputed rule would materially *impair* the effectiveness of a militia, though perhaps some other showing could suffice. We need not fix the exact form of the required relationship, however, because FOP has presented no evidence on the matter at all.

Instead FOP simply argues that, in "most" states, police officers can be called into service as militia members. But none of the nine states' provisions it cites appears to make police officers any more susceptible to such service than ordinary citizens (or in some cases, than males between the ages of 17 and 45). In any event, § 922(g)(9) does not hinder the militia service of all police officers, only of domestic violence misdemeanants whose convictions have not been expunged, etc. FOP never indicates how restrictions on the latter, relevant class would have a material impact on the militia.

*Tenth Amendment*

■ FOP's Tenth Amendment challenge fails because § 922(g)(9) does not force state officials to do anything affirmative to implement its bar on domestic violence misdemeanants' possession of firearms. The Amendment forbids the federal government to "conscript[ ] the State's officers" to "enforce a federal regulatory program," *Printz v. United States*, 521 U.S. 98, 117 S.Ct. 2365, 2384, 138 L.Ed.2d 914 (1997), but FOP has presented no evidence that § 922(g)(9) enacts any such conscription.

Although the Gun Control Act does not designate an agency responsible for enforcement of its criminal provisions, both the contentions of the parties and undisputed record evidence indicate that federal authorities, in particular the Bureau of Alcohol, Tobacco, and Firearms ("ATF"), have such enforcement responsibility for § 922(g)(9). See Memo in Support of Plaintiff's Motion for a Preliminary Injunction, at 2; Gov't Br. at 33; Nicholas M. Gess, Director, Office of Intergovernmental Affairs, Department of Justice, "Memorandum for All Interested Law Enforcement Groups," Dec. 6, 1996, at 2. It is true that ATF has made suggestions to state and local law enforcement officials about how best to deal with employees newly disqualified from carrying firearms. See, e.g., John W. Magaw, Director, ATF, "Open Letter to All State and Local Law

Enforcement Officials," Nov. 26, 1996, at 2–3. But even if these purported to require nonfederal authorities to embark on active enforcement measures, they would evidently represent a transgression of the Bureau's statutory authority rather than dutiful implementation of an unconstitutional statute. In fact, however, the Open Letter does not seem to suggest even an implied claim of authority to compel local law enforcement officials to take active measures. For employees subject to the disability, it advises that "[i]f such person refuses to relinquish the firearm ... , and your agency is without authority to retain or seize the firearm ... , you should contact the local ATF office." *Id.* at 3.

▌ FOP argues that § 922(g)(9) unconstitutionally restricts states' power to determine police officers' "qualifications for office," FOP Br. at 21, by prohibiting domestic violence misdemeanants from holding law enforcement positions requiring the use of firearms. But assuming that this constitutes federal regulation of "core" areas of state sovereignty, the Supreme Court no longer reads the Tenth Amendment as forbidding such regulation, relegating to the political process the states' protection from undue intrusion in this form. See *South Carolina v. Baker,* 485 U.S. 505, 511, 108 S.Ct. 1355, 99 L.Ed.2d 592 (1988); *Garcia v. San Antonio Metro. Transit Auth.,* 469 U.S. 528, 550–54, 105 S.Ct. 1005, 83 L.Ed.2d 1016 (1985).

Even if the Tenth Amendment insulated some areas of state activity from negative federal regulation, FOP's claim would be overbroad. It may commonly be a side effect of federal prohibitions to impair offenders' fitness for service as a police officer. Showing up for work at some spot other than a federal prison is a qualification for most state positions; federal incarceration intrudes inescapably. Of course § 925(a)(1)'s exemption for state-issued weapons protects states from this sort of peripheral interference as to all persons barred by federal law from weapons possession other than domestic violence misdemeanants, but the exemption's existence does not establish it either as a constitutional right or as a baseline for measuring claims under the Tenth Amendment—or any other constitutional provision.

*Commerce Clause*

▌ FOP argues that § 922(g)(9) is beyond Congress's power to enact under the commerce clause. We join all the numbered circuits[2] in rejecting this argument because § 922(g)(9) contains a "jurisdictional element": in any prosecution under the provision for possession, the government must prove that the defendant possessed the firearm "in or affecting commerce."

In *United States v. Bass,* 404 U.S. 336, 92 S.Ct. 515, 30 L.Ed.2d 488 (1971), the Supreme Court confronted an ambiguity in a provision imposing penalties on any felon who "receives, possesses, or transports in commerce or affecting commerce ... any firearm." The United States argued that the phrase "in commerce or affecting commerce" qualified only "transports," while the defendant contended that the commerce requirement applied to "receives" and "possesses" as well. The Court resolved the ambiguity in favor of the defendant and noted that that disposition made it unnecessary to reach the question "whether, upon appropriate findings, Congress can constitutionally punish the 'mere possession' of firearms." *Bass,* 404 U.S. at

---

**2.** See *United States v. Smith,* 101 F.3d 202, 215 (1st Cir.1996); *United States v. Sorrentino,* 72 F.3d 294, 296 (2d Cir.1995); *United States v. Gateward,* 84 F.3d 670, 672 (3d Cir. 1996); *United States v. Wells,* 98 F.3d 808, 811 (4th Cir.1996); *United States v. Rawls,* 85 F.3d 240, 242 (5th Cir.1996); *United States v. Turner,* 77 F.3d 887, 889 (6th Cir.1996); *United States v. Lewis,* 100 F.3d 49, 52 (7th Cir. 1996); *United States v. Barry,* 98 F.3d 373, 378 (8th Cir.1996); *United States v. Nguyen,* 88 F.3d 812, 820–21 (9th Cir.1996); *United States v. Bolton,* 68 F.3d 396, 400 (10th Cir. 1995); *United States v. McAllister,* 77 F.3d 387, 390 (11th Cir.1996).

339 n. 4, 92 S.Ct. 515. Since the Court held that a qualification substantially identical to the one here made it unnecessary even to consider whether the prohibition in question exceeded Congress's power, the enactment here, as so qualified, must also fall within Congress's authority.[3] *United States v. Lopez,* 514 U.S. 549, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995), does not change the impact of *Bass,* for in *Lopez* the Court explicitly noted that the law there held unconstitutional contained "no jurisdictional element which would ensure, through case-by-case inquiry, that the firearm possession in question affects interstate commerce." *Id.* at 561, 115 S.Ct. 1624. See also *United States v. Harrington,* 108 F.3d 1460, 1465 (D.C.Cir.1997), in which we found that the government had presented enough evidence to satisfy the Hobbs Act provision criminalizing robbery or extortion that "obstructs, delays, or affects commerce," 18 U.S.C. § 1951(a), and made clear that satisfaction of such a requirement would bring the statute safely within the Congress's commerce clause authority.

Finally, to the extent that ATF missives on the subject may be disregarding the jurisdictional element, see ATF, "Misdemeanor Crime of Domestic Violence: Questions and Answers," Feb. 14, 1997, at 1 (saying that "law enforcement officers and other Government officials who have been convicted of a disqualifying misdemeanor may not lawfully possess or receive firearms or ammunition for any purpose, including performance of their official duties"), such communications pose an issue of agency excess of statutory authority, which here would be dispositive before any constitutional issue would be reached.

\* \* \*

The district court's order granting summary judgment for the defendant is

*Affirmed.*

---

**3.** 18 U.S.C. § 922(d)(9), barring transfer of firearms to the various proscribed persons, lacks any such explicit jurisdictional hook,

but FOP has not challenged that provision, as its counsel conceded at oral argument on rehearing.