KAREN LECRAFT HENDERSON, Circuit Judge,
dissenting.
As has been noted by Fifth Circuit Judge Robert M. Parker in United States v. Emerson, 270 F.3d 203, 272 (2001) (“The fact that the 84 pages of dicta contained in [the majority opinion] are interesting, scholarly, and well written does not change the fact that they are dicta and amount to at best an advisory treatise on this long-running debate.”) (Parker, J., concurring), exhaustive opinions on the origin, purpose and scope of the Second Amendment to the United States Constitution have proven to be irresistible to the federal judiciary. See, e.g., Silveira v. Lockyer, 312 F.3d 1052, 1060-87 (9th Cir.2003) (as amended); Emerson, 270 F.3d at 218-72. The result has often been page after page of “dueling dicta” — each side of the debate offering law review articles and obscure historical texts to support an outcome it deems proper. Today the majority adds another fifty-plus pages to the pile.[1] Its superfluity is even more pronounced, however, because the meaning of the Second Amendment in the District of Columbia (District) is purely academic. Why? As Judge Walton declared in Seegars v. Ashcroft, 297 F.Supp.2d 201, 239 (D.D.C.2004), ajfd in part, rev’d in part sub nom. See *402 gars v. Gonzales, 396 F.3d 1248, reh’g en banc denied, 413 F.3d 1 (2005), “the District of Columbia is not a state within the meaning of the Second Amendment and therefore the Second Amendment’s reach does not extend to it.” -For the following reasons, I respectfully dissent.
I.
As our court has recognized, the United States Supreme Court’s guidance on the Second Amendment is “notoriously scant.” Fraternal Order of Police v. United States, 173 F.3d 898, 906 (D.C.Cir.1999) (FOP). While scant it may be, it is, at least to me, unmistakable in one respect. And in that one respect, it dooms appellant Heller’s challenge.[2]
In United States v. Miller, 307 U.S. 174, 59 S.Ct. 816, 83 L.Ed. 1206 (1939), the only twentieth-century United States Supreme Court decision that analyzes the scope of the Second Amendment, the Government appealed the district court’s quashing of an indictment that charged Miller (and one other) with a violation of section 11 of the National Firearms Act, Pub.L. No. 474, 48 Stat. 1236, 26 U.S.C. §§ 1132 et seq. (1934), by transporting in interstate commerce an unregistered, short-barreled shotgun. Miller, 307 U.S. at 175 & n. 1, 59 S.Ct. 816. The district court had quashed the indictment because it concluded that section 11 of the National Firearms Act violated the Second Amendment. Id. at 177, 59 S.Ct. 816. The High Court disagreed, declaring:
In the absence of any evidence tending to show that possession or use of a ‘shotgun having a barrel of less than eighteen inches in length’ at this time has some reasonable relationship to the preservation or efficiency of a well regulated militia, we cannot say that the Second Amendment guarantees the right to keep and bear such an instrument. Certainly it is not within judicial notice that this weapon is any part of the ordinary military equipment or that its use could contribute to the common defense.
Id. at 178, 59 S.Ct. 816 (emphases added). Then, quoting Article I, § 8 of the Constitution,[3] the Court succinctly — but unambiguously — set down its understanding of the Second Amendment: “With obvious purpose to assure the continuation and render possible the effectiveness of such forces the declaration and guarantee of *403 the Second Amendment were made. It must be interpreted and applied with that end in view.” Id. (emphases added). By these words, it emphatically declared that the entire Second Amendment — both its “declaration” and its “guarantee” — “must be interpreted and applied” together. Id.[4] Construing its two clauses together so that, as Miller declares, the right of the people[5] to keep and bear arms relates to *404 those Militia whose continued vitality is required to safeguard the individual States, I believe that, under Miller, the District is inescapably excluded from the Second Amendment because it is not a State.[6] However the Second Amendment right has been subsequently labeled by others — whether collective, individual or a modified version of either — Miller’s label is the only one that matters.[7] And until and unless the Supreme Court revisits Miller, its reading of the Second Amendment is the one we are obliged to follow. See Welch v. Tex. Dep’t of Highways & Pub. Transp., 483 U.S. 468, 478-79, 107 S.Ct. 2941, 97 L.Ed.2d 389 (1987) (“The rule of law depends in large part on adherence to the doctrine of stare decisis.”); United States v. Rybar, 103 F.3d 273, 286 (3d Cir.1996) (“As one of the inferior federal courts subject to the Supreme Court’s precedents, we have neither the license nor the inclination to engage in such freewheeling presumptuousness.” (responding to argument that Miller is “wrong in its superficial (and one-sided) analysis of the Second Amendment” (internal quotation omitted))).[8]
*405 II.
The Supreme Court has long held that “State” as used in the Constitution refers to one of the States of the Union. Chief Justice John Marshall, in rejecting the argument that the District constitutes a “State” under Article III, section 2 of the Constitution and, derivatively, the Judiciary Act of 1789, explained:
[I]t has been urged that Columbia is a distinct political society; and is therefore “a state” according to the definitions of writers on general law. This is true. But as the act of congress obviously uses the word “state” in reference to that term as used in the constitution, it becomes necessary to inquire whether Columbia is a state in the sense of that instrument. The result of that examination is a conviction that the members of the American confederacy only are the states contemplated in the constitution.... [T]he word state is used in the constitution as designating a member of the union, and excludes from the term the signification attached to it by writers on the law of nations.
Hepburn & Dundas v. Ellzey, 2 Cranch 445, 6 U.S. 445, 452-53, 2 L.Ed. 332 (1805) (emphasis added); see also De Geofroy v. Riggs, 133 U.S. 258, 269, 10 S.Ct. 295, 33 L.Ed. 642 (1890). In fact, the Constitution uses “State” or “States” 119 times apart from the Second Amendment and in 116 of the 119, the term unambiguously refers to the States of the Union.[9] U.S. Const., passim. Accepted statutory construction directs that we give “State” the same meaning throughout the Constitution. Cf. Sorenson v. Sec’y of the Treasury, 475 U.S. 851, 860, 106 S.Ct. 1600, 89 L.Ed.2d 855 (1986) (“The normal rule of statutory construction assumes that identical words used in different parts of the same act are intended to have the same meaning.” (internal quotations omitted)).[10]
*406 Although “the Constitution is in effect ... in the District,” O’Donoghue v. United States, 289 U.S. 516, 541, 53 S.Ct. 740, 77 L.Ed. 1356 (1933), as it is in the States, “[a] citizen of the district of Columbia is not a citizen of a state within the meaning of the constitution.” Hepburn, 6 U.S. at 445 (emphasis in original). Accordingly, both the Supreme Court and this court have consistently held that several constitutional provisions explicitly referring to citizens of “States” do not apply to citizens of the District. See id. at 452-53; see also Bolling v. Sharpe, 347 U.S. 497, 498-99, 74 S.Ct. 693, 98 L.Ed. 884 (1954) (District not “State” under Fourteenth Amendment); Adams v. Clinton, 531 U.S. 941, 121 S.Ct. 336, 148 L.Ed.2d 270 (2000), aff'g 90 F.Supp.2d 35 (D.D.C.2000) (three-judge district court held that Constitution does not guarantee District citizens right to vote for members of Congress because District does not constitute “State” within Constitution’s voting clauses [11]); LaShawn v. Barry, 87 F.3d 1389, 1394 n. 4 (D.C.Cir.1996) (“The District of Columbia is not a state. It is the seat of our national government .... Thus, [the Eleventh Amendment] has no application here.”); Lee v. Flintkote Co., 593 F.2d 1275, 1278 n. 14 (D.C.Cir.1979) (“[T]he District, unlike the states, has no reserved power to be guaranteed by the Tenth Amendment.”). On the other hand, the Supreme Court and this court have held that the District can parallel a “State” within the meaning of some constitutional provisions. Loughran v. Loughran, 292 U.S. 216, 228, 54 S.Ct. 684, 78 L.Ed. 1219 (1934) (Full Faith and Credit Clause binds “courts of the District ... equally with courts of the states”); Milton S. Kronheim & Co. v. District of Columbia, 91 F.3d 193, 198-99 (D.C.Cir.1996) (while “D.C. is not a state,” Commerce Clause and Twenty-first Amendment apply to District). Ultimately, “[wjhether the District of Columbia constitutes a ‘State or Territory’ within the meaning of any particular statutory or constitutional provision depends upon the character and aim of the specific provision involved.” District of Columbia v. Carter, 409 U.S. 418, 419-20, 93 S.Ct. 602, 34 L.Ed.2d 613 (1973) (emphasis added).
The Second Amendment’s “character and aim” does not require that we treat the District as a State. The Amendment was drafted in response to the perceived threat to the “free[dom]” of the “State[s]” posed by a national standing army controlled by the federal government. See, e.g., Emerson, 270 F.3d at 237-40, 259; Silveira, 312 F.3d at 1076. In Miller, the Supreme Court explained that “[t]he sentiment of the time [of the Amendment’s drafting] strongly disfavored standing armies; the common view was that adequate defense of country and laws could be secured through the Militia” composed of men who “were expected to appear bearing arms supplied by themselves.” 307 U.S. at 179, 59 S.Ct. 816. Indeed, at the time of the Constitutional Convention, “there was a widespread fear that a national standing Army posed an intolerable threat to individual liberty and to the sovereignty of the separate States.” Perpich v. Dep’t of Defense, 496 U.S. 334, 340, 110 S.Ct. 2418, 110 L.Ed.2d 312 (1990) (emphasis added). The Second Amendment, then, “aimed” to secure a military balance of power between the States on the one hand and the federal government on the other.[12] Unlike the States, the District had — and *407 has — no need to protect itself from the federal government because it is a federal entity created as the seat of that government.
[T]he Second Amendment was included in the Bill of Rights to ensure that the people would have the ability to defend themselves against a potentially oppressive federal government, which had just been given the authority to maintain a national standing army in Article I of the Constitution. But, the drafters of the Constitution having provided for a ‘District ... [to] become the Seat of the Government of the United States,’ and having given Congress ‘exclusive’ authority both to legislate over this District and to exercise control over ‘the Erection of Forts, Magazines, [and] Arsenals ..surely it was not intended for the protection afforded by the Second Amendment to apply to an entity that had been created to house the national seat of government. In other words, there is no reason to believe that the First Congress thought that the federal seat of government needed to be protected from itself when the Second Amendment was adopted.
Seegars, 297 F.Supp.2d at 238-39 (internal citations omitted) (emphasis and alterations in original);[13] see also Sandidge v. *408 United States, 520 A.2d 1057, 1058 (D.C.1987) (“assuming the second amendment applies to the District of Columbia,” majority holds “the Second Amendment guarantees a collective rather than an individual right” (internal quotation omitted)); see also id. at 1059 (Nebeker, J., concurring) (“I conclude first that [the Second Amendment] does not apply to the Seat of the Government of the United States.”).
III.
In its origin and operation, moreover, the District is plainly not a “State” of the Union. It is, instead, “an exceptional community,” District of Columbia v. Murphy, 314 U.S. 441, 452, 62 S.Ct. 303, 86 L.Ed. 329 (1941), that “[u]nlike either the States or Territories, ... is truly sui generis in our governmental structure.” Carter, 409 U.S. at 432, 93 S.Ct. 602. The Constitution provides for the creation of the District in Article I, granting the Congress the power “[t]o exercise exclusive Legislation in all Cases whatsoever, over such District (not exceeding ten Miles square) as may, by Cession of particular States, and the Acceptance of Congress, become the Seat of the Government of the United States.” U.S. Const. Art. I, § 8, cl. 17. As the Supreme Court explained in O’Do-noghue, “The object of the grant of exclusive legislation over the district was ... national in the highest sense, and the city organized under the grant became the city, not of a state, not of a district, but of a nation.” 289 U.S. at 539^0; 53 S.Ct. 740 (internal quotations and citations omitted). In other words, the District is “the capital — the very heart — of the Union itself ... within which the immense powers of the general government were destined to be exercised for the great and expanding population of forty-eight states.” Id. at 539, 53 S.Ct. 740.
The Congress possesses plenary power over the District and its officers. Id. “Indeed, ‘[t]he power of Congress over the District of Columbia includes all the legislative powers which a state may exercise over its affairs.’ ” Carter, 409 U.S. at 429, 93 S.Ct. 602 (quoting Berman v. Parker, 348 U.S. 26, 31, 75 S.Ct. 98, 99 L.Ed. 27 (1954)). Although the Congress delegated certain authority to the District’s local government in the Home Rule Act of 1973, D.C.Code §§ 1-201.01 et seq., it reserved the authority to enact legislation “on any subject,” D.C.Code § 1-206.01, and to repeal legislation enacted by the local government, id. § 1 — 206.02(c)(1). See Bliley v. Kelly, 23 F.3d 507, 508 (D.C.Cir.1994) (describing Home Rule Act).
As do the States, the District maintains a “militia” of “[ejvery able-bodied male citizen ... of the age 18 years and under the age of 45 years” residing in the District, D.C.Code § 49-401, which includes an “organized” division that is “designated the National Guard of the District of Columbia,” D.C.Code § 49-406. Nevertheless, the District is again unique in that its militia “is essentially a component of the federal government.” Seegars, 297 F.Supp.2d at 241. That is, it is controlled by the federal government and acts only on the order of the President.[14] Executive Order 11,485 authorizes the Secretary of *409 the United States Department of Defense to “supervise, administer and control” the District’s National Guard “while in militia status” and to “order out the National Guard ... to aid the civil authorities of the District of Columbia.” Exec. Order No. 11,485, 34 Fed.Reg. 15,411 § 1 (Oct. 1, 1969). The Executive Order also provides that the “Commanding General and the Adjutant General of the National Guard will be appointed by the President,” id. § 3, and that the Commanding General “shall report to the Secretary of Defense,” id. § 1; see also D.C.Code § 49 — 301(a)—(b) (“There shall be appointed and commissioned by the President of the United States a Commanding General of the militia of the District of Columbia .... [T]he Commanding General of the militia of the District of Columbia shall be considered to be an employee of the Department of Defense.”). Unlike a State Governor who can mobilize the State militia during civil unrest,[15] the Mayor of the District must request the President to mobilize the District’s militia. D.C.Code § 49-103 (“[I]t shall be lawful for the Mayor of the District of Columbia ... to call on the Commander-in-Chief to aid ... in suppressing ... violence and enforcing the laws; the Commander-in-Chief shall thereupon order out so much and such portion of the militia as he may deem necessary to suppress the same .... ”). See generally Seegars, 297 F.Supp.2d at 240-41 (discussing structure of District’s militia).
To sum up, there is no dispute that the Constitution, case law and applicable statutes all establish that the District is not a State within the meaning of the Second Amendment. Under United States v. Miller, 307 U.S. at 178, 59 S.Ct. 816, the Second Amendment’s declaration and guarantee that “the right of the people to keep and bear Arms, shall not be infringed” relates to the Militia of the States only. That the Second Amendment does not apply to the District, then, is, to me, an unavoidable conclusion.
For the foregoing reasons, I would affirm the district court’s dismissal of Heller’s Second Amendment challenge to section 7-2502.02(a)(4) for failure to state a claim for relief under Federal Rule of Civil Procedure 12(b)(6). I would affirm its dismissal of the other five appellants’ claims as well as Heller’s other claims for lack of standing under Federal Rule of Civil Procedure 12(b)(1). Accordingly, I respectfully dissent.

. In declaring the District's challenged firearms ordinances unconstitutional, the majority takes over 45 pages, Maj. Op. at 377-401, explaining that the Second Amendment establishes an unrestricted individual right to keep and bear arms, see id. at 395. Its analysis can be summarized as follows: The Second Amendment’s guarantee clause — “the right of the people to keep and bear Arms, shall not be infringed” — endows "the people” with a right analogous to the individual rights guaranteed in the First and Fourth Amendments. Id. at 380-82 (citing United States v. Verdugo-Urquidez, 494 U.S. 259, 265, 110 S.Ct. 1056, 108 L.Ed.2d 222 (1990)). That right is unrestricted by the prefatory clause — "A well regulated' Militia, being necessary to the security of a free State” — which simply enunciates the Amendment’s "civic purpose,” Maj. Op. at 395, and modifies only the word "Arms” in the operative clause, id. at 390-91 (citing United States v. Miller, 307 U.S. 174, 59 S.Ct. 816, 83 L.Ed. 1206 (1939)).

. The other five appellants lack standing, see Seegars v. Gonzalez, 396 F.3d 1248 (D.C.Cir.2005), and Heller has standing to challenge only D.C.Code § 7-2502.02(a)(4), under which he applied for, and was denied, a pistol permit. The only difference between the standing of the appellants in this case and that of the Seegars appellants relates to Heller’s permit denial. That is, none of the appellants here, including Heller, faces imminent injury from D.C.Code § 7-2507.02, which requires that any registered firearm be kept unloaded and disassembled or bound by a trigger lock or similar device, or section 22-4504, which prohibits carrying an unregistered pistol. They "allege no prior threats against them [based on those provisions] or any characteristics indicating an especially high probability of enforcement [of those provisions] against them.” Seegars, 396 F.3d at 1255. Although the appellants lack an administrative remedy with respect to the trigger lock provision, we have already decided "its absence is not enough to render [their] claim[s] justiciable if the imminence of the threatened injury is inadequate.” Id. at 1256.

. Article I, section 8 of the Constitution provides:
The Congress shall have Power ...
To provide for calling forth the Militia to execute the Laws of the Union, suppress Insurrections and repel Invasions;
To provide for organizing, arming, and disciplining, the Militia, and for governing such Part of them as may be employed in the Service of the United States, reserving to the States respectively, the Appointment of the Officers, and the Authority of training the Militia according to the discipline prescribed by Congress.
U.S. Const., Art. I, § 8, els. 15-16.

. Nine of our sister circuits have noted that the declaratory clause modifies the guarantee clause. See Silveira, 312 F.3d at 1066 ("The amendment protects the people's right to maintain an effective state militia, and does not establish an individual right to own or possess firearms for personal or other use.”); Gillespie v. City of Indianapolis, 185 F.3d 693, 711 (7th Cir.1999) ("Because Gillespie has no reasonable prospect of being able to demonstrate ... a nexus between the firearms disability imposed by the statute and the operation of state militias, [the district court judge] was right to dismiss his Second Amendment claim.”); United States v. Wright, 117 F.3d 1265, 1273 (11th Cir.1997) ("[T]he Miller Court understood the Second Amendment to protect only the possession or use of weapons that is reasonably related to a militia actively maintained and trained by the states.”); United States v. Rybar, 103 F.3d 273, 286 (3d Cir.1996) ("[T]he Miller Court assigned no special importance to the character of the weapon itself, but instead demanded a reasonable relationship between its 'possession or use’ and militia-related activity."(quoting Miller, 307 U.S. at 178, 59 S.Ct. 816)); Love v. Pepersack, 47 F.3d 120, 124 (4th Cir.1995) ("The courts have consistently held that the Second Amendment only confers a collective right of keeping and bearing arms which must bear a 'reasonable relationship to the preservation or efficiency of a well-regulated militia.’ ” (quoting Miller, 307 U.S. at 178, 59 S.Ct. 816)); United States v. Hale, 978 F.2d 1016, 1020 (8th Cir.1992) ("Whether the 'right to bear arms’ for militia purposes is ‘individual’ or 'collective' in nature is irrelevant where, as here, the individual's possession of arms is not related to the preservation or efficiency of a militia.”); United States v. Oakes, 564 F.2d 384, 387 (10th Cir.1977) ("The purpose of the second amendment as stated by the Supreme Court in United States v. Miller ... was to preserve the effectiveness and assure the continuation of the state militia. The Court stated that the amendment must be interpreted and applied with that purpose in view.”); United States v. Warin, 530 F.2d 103, 106 (6th Cir.1976) ("[T]he Second Amendment right 'to keep and bear Arms' applies only to the right of the State to maintain a militia and not to the individual’s right to bear arms ....” (internal quotation omitted)); Cases v. United States, 131 F.2d 916, 923 (1st Cir.1942) ("[Tjhere is no evidence that the appellant was or ever had been a member of any military organization or that his use of the weapon under the circumstances disclosed was in preparation for a military career.”). In Cases, the First Circuit considered, inter alia, a Puerto Rican criminal defendant's Second Amendment challenge to the Federal Firearms Act. Significantly, the court qualified its Second Amendment analysis as follows:
The applicability of the restriction imposed by the Second Amendment upon the power of Congress to legislate for Puerto Rico, or for that matter any territory, raises questions of no little complexity. However, we do not feel called upon to consider them because we take the view that the Federal Firearms Act does not unconstitutionally infringe the appellant’s right, if any one in a territory has any right at all, to keep and bear arms.
Cases, 131 F.2d at 920.

. I have not overlooked the language in United States v. Verdugo-Urquidez, 494 U.S. 259, 265, 110 S.Ct. 1056, 108 L.Ed.2d 222 (1990), to the effect that "the people” as used in various of the first Ten Amendments refers to "a class of persons who are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of that community.” But just as the Tenth Amendment ties the rights reserved thereunder to "the people” of the individual "States,” thereby excluding "the people” of the District, cf. Lee v. Flintkote Co., 593 F.2d 1275, 1278 n. 14 (D.C.Cir.1979) ("[T]he District, unlike the states, has no reserved power to be guaranteed by the Tenth Amendment.”), the Second Amendment similarly limits "the people” to those of the States, cf. Adams v. Clinton, 90 F.Supp.2d 35, 45 (D.D.C.2000) (“Although standing alone the phrase 'people of the several States’ [in Article I, § 2, cl. 1] could be read as meaning all the people of the 'United States' and not simply those who are citizens of individual states, *404 [Article l’s] subsequent and repeated references to 'state[s]’ ... make clear that the former was not intended."); see also Verdugo-Urquidez, 494 U.S. at 265, 110 S.Ct. 1056 (citing U.S. Const. Art. I, § 2, cl. 1).

. Nor do the Militia Clauses (U.S. Const.Art. I, § 8, cls.15,16) conflict with the view that the “Militia” of the Second Amendment means those of the States. As used in the Militia Clauses, "Militia” is plural. Indeed, Article I, section 8, clause 16 states that the Congress shall have the power "[t]o provide for organizing, arming, and disciplining, the Militia, and for governing such Part of them.” (emphasis added). Article II, section 2 also indicates the Militia Clauses refer to "the Militia of the several States.” U.S. Const. Art. II, § 2, cl. 1 (emphasis added); cf. Oxford English Dictionary 768 (2d ed. 1989) ("Militia” "4. spec. a. Orig., the distinctive name of a branch of the British military service, forming, together with the volunteers, what are known as 'the auxiliary forces' as distinguished from the regular army .... (Construed either as sing, or plural.)").

. Our court has previously "assume[d]" the Miller "test” to mean that the guarantee must be read in light of the declaration. See FOP, 173 F.3d at 906.

. One nineteenth-century Supreme Court precedent, United States v. Cruikshank, 92 U.S. 542, 23 L.Ed. 588 (1875), is included in almost every discussion of the Second Amendment. Miller, however, does not cite Cruikshank, and for good reason. In that case, several criminal defendants challenged their convictions under the Enforcement Act of 1870 making it unlawful to threaten or intimidate “ 'any citizen, with intent to prevent or hinder his free exercise and enjoyment of any right or privilege granted or secured to him by the constitution or laws of the United States.' ” Id. at 548 (quoting 16 Stat. 141). In setting aside their convictions, the Supreme Court declared:
[The right to bear arms for any lawful purpose] is not a right granted by the Constitution. Neither is it in any manner dependent upon that instrument for its existence. The second amendment declares that it shall not be infringed; but this, as has been seen, means no more than that it shall not be infringed by Congress.
Id. at 553. This language does not conflict with Miller — as I read Miller — because it does not define the right but simply recognizes that the right, whatever its content, cannot be infringed by the federal government. More interesting is the nineteenth-century case Miller does cite, Presser v. Illinois, 116 U.S. 252, 6 S.Ct. 580, 29 L.Ed. 615 (1886). There, the Court upheld state legislation against a Second Amendment challenge, relying on Cruikshank's holding that the Second Amendment constrains the national government only. The Court then included the following language:
[T]he states cannot, even laying the constitutional provision in question out of view, prohibit the people from keeping and bearing arms, so as to deprive the United States of their rightful resource for maintaining the public security, and disable the people from performing their duty to the general government.
Id. at 584.

. In three instances the Constitution refers to a "foreign State,” see U.S. Const. Art. I, § 9, cl. 8; id. Art. Ill, § 2, cl. 1; id. amend. XI. "State” with a plainly different meaning also appears in reference to the President’s "State of the Union.” Id. Art. II, § 3, cl. 1. The Constitution refers to "a” State five times. See id. Art. Ill, § 2, els. 1, 2; id. amend. XX3II, § 1, cl. 2. A descriptive adjective precedes “State” two times. See id. Art. IV, § 3, cl. 1 ("no new State"); id. amend. XXIII, § 1, cl. 2 ("the least populous State”).

. The legislative history of the Second Amendment also supports the interpretation of "State” as one of the States of the Union. In the First Congress, James Madison proposed language that a well-regulated militia was "the best security of a free country." David Yassky, The Second Amendment: Structure, History, and Constitutional Change, 99 Mich. L.Rev. 588, 610 (2000) (citing Creating the Bill of Rights: The Documentary Record from the First Federal Congress 12 (Helen E. Veit, Kenneth R. Bowling & Charlene Bangs Bickford eds., 1991) (Documentary Record)) (emphasis added). After the proposal was submitted to an eleven-member House of Representatives committee (including Madison), however, "country” was changed to "State.” Id. (citing Documentary Record, supra, at 30). As Judge Walton noted:
Anti-Federalist Elbridge Gerry explained that changing the language to "necessary to the security of a free State” emphasized the primacy of the state militia over the federal standing army: “A well-regulated militia being the best security of a free state, admitted an idea that a standing army was a secondary one.”
Seegars, 297 F.Supp.2d at 229 (internal quotation omitted) (citing Yassky, supra (quoting The Congressional Register, August 17, 1789)). Indeed, in light of the meaning of "State” as used throughout the Constitution, see supra p. 5, and the care the drafters are presumed to have taken in selecting specific language, see Holmes v. Jennison, 39 U.S. 540, 570-71, 14 Pet. 540, 10 L.Ed. 579 (1840) ("Every word [in the Constitution] appears to have been weighed with the utmost deliberation, and its force and effect to have been fully understood.”), the change plainly suggests that the drafters intended to clarify that the right established in the Second Amendment was intended to protect the "free[dom]” of the "State[s]” of the Union rather than the “country.”

. U.S. Const. Art. I, §§ 2-4.

. As noted in Seegars :
[I]n his efforts to convince the people of the advantages of the Constitution in The Federalist Papers, James Madison noted that although the federal government had a standing army, the people would have the use of militias, stating:
Let a regular army, fully equal to the resources of the country, be formed; and let it be entirely at the devotion of the federal government: still it would not be going too far to say that the State govern *407 ments with the people on their side would be able to repel the danger:... Besides the advantage of being armed, which the Americans possess over the people of almost every other nation, the existence of subordinate governments, to which the people are attached and by which the militia officers are appointed, forms a barrier against the enterprises of ambition, more insurmountable than any which a simple government of any form can admit of.
Seegars, 297 F.Supp.2d at 235 (internal quotation omitted) (quoting The Federalist No. 46, at 267 (Clinton Rossiter ed., 1961)).

. Even if the District were to be considered a "State” under the Second Amendment, I do not believe D.C.Code § 7-2502.02(a)(4) could be challenged thereunder., When adopted, the Bill of Rights protected individuals only against the federal government. See, e.g., Barron v. City of Baltimore, 32 U.S. 243, 247, 7 Pet. 243, 8 L.Ed. 672 (1833). Under the "incorporation” doctrine, however, "many of the rights guaranteed by the first eight Amendments to the Constitution have been held [by the Supreme Court] to be protected against state action by the Due Process Clause of the Fourteenth Amendment.” Duncan v. Louisiana, 391 U.S. 145, 149, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1968) (Sixth Amendment right to jury trial in criminal case protected against state action); see also Benton v. Maryland, 395 U.S. 784, 795, 89 S.Ct. 2056, 23 L.Ed.2d 707 (1969) ("Once it is decided that a particular Bill of Rights guarantee is fundamental to the American scheme of justice, the same constitutional standards apply against both the State and Federal Governments.” (internal quotation and citation omitted)). But the Supreme Court has never held that the Second Amendment has been incorporated. Cf. United States v. Cruikshank, 92 U.S. 542, 553, 23 L.Ed. 588 (1875) ("[The Second Amendment] is one of the amendments that has no other effect than to restrict the powers of the national government .... ”); see also Love, 47 F.3d at 123 (“The Second Amendment does not apply to the states.” (citing Cruikshank, 92 U.S. 542, 23 L.Ed. 588)); Cases, 131 F.2d at 921-22 ("Whatever rights ... the people may have [under the Second Amendment] depend upon local legislation; the only function of the Second Amendment being to prevent the federal government and the federal government only from infringing that right.” (citing Cruikshank, 92 U.S. at 553)). Thus, the Amendment does not apply to gun laws enacted by the States. Because the Second Amendment "was specifically included by the drafters of the Bill of Rights to protect the states against a potentially oppressive federal government,” Seegars, 297 F.Supp.2d at 230, it would make little sense to incorporate the Amendment. Although the District is a federal enclave and thus the Second Amendment might seem to apply without regard to incorporation, to hold that the District constitutes a "State” under the Amendment and yet, at the same time, to treat its laws as federal is a self-contradiction. In other words, either the District, as a federal enclave, enacts federal law, including *408 D.C.Code § 7-2502.02(a)(4), or the District is a "State” and D.C.Code § 7-2502.02(a)(4) is state legislation to which the unincorporated Second Amendment does not apply.

. "The President of the United States shall be the Commander-in-Chief of the militia of the District of Columbia.” D.C.Code § 49-409 (emphasis added); see also id. § 49-404 ("The enrolled militia shall not be subject to any duty except when called into the service of the United States, or to aid the civil authorities in the execution of the laws or suppression of riots.”); id. § 49-405 ("Whenever it shall be necessary to call out any portion of the enrolled militia the Commander-in-Chief shall order out, by draft or otherwise, or accept as volunteers as many as required.”).

. See, e.g., 4 Pa.Code § 7.211(a) ("The Governor will retain command of State peacekeeping forces during a civil disorder.") (emphasis added), (d) ("In the event of disorder, ... [wjeapons carried by the National Guard will not be loaded nor will bayonets be fixed without the specific order of the Governor.”) (emphasis added).